PATRICK BOYLE, GUARDIAN, *v.* WILLIAM T. GRIFFIN, GUARDIAN.

1. PARENT AND CHILD. *Domicile.*
   The domicile of a father is the domicile of his infant children.

2. GUARDIANS. *Foreign appointment. Right to infants' funds. Code 1892, §§ 2211, 1925.*
   A foreign guardian is not required, under Code 1892, § 2211, empowering him to sue for and receive property of his ward upon the same terms as foreign executors and administrators are authorized to sue for and recover property belonging to a decedent's estate, to file his letters of guardianship, etc., in this state before receiving a check payable to himself as guardian, although, under Code 1892, § 1925, a foreign executor or administrator cannot sue for or recover the property of the estate until he has filed a certified copy of the record of his appointment in the proper chancery court in this state.

FROM the chancery court of Tallahatchie county.

HON. CAREY C. MOODEY, Chancellor.

Griffin, guardian, appellee, was complainant, and Boyle, guardian, appellant, was defendant in the court below. The suit was an attachment in chancery against a nonresident defendant. From a decree largely in complainant's favor the defendant appealed to the supreme court. The facts are fully stated in the opinion of the court.

*Finlay & Finlay,* for appellant.

The evidence establishes beyond dispute that Tryon changed his domicil from Tutwiler, Miss., to Memphis, Tenn., before his death. Tryon's will commences thus: "I, Andrew E. Tryon, LATE of Tutwiler, NOW of Memphis, Tennessee." McCoy and Hoffman, the witnesses to the will, say that each paragraph of the will was read over to Tryon and after hearing each, Tryon expressed his approval, so that the statement of

residence is not merely perfunctory and formal, but deliberate and intentional.

As residence is altogether a matter of choice and volition, the clear and explicit statement of the will is final on the question of Tryon's domicil, which, however, is abundantly proved otherwise.

There was no property in Mississippi belonging to the two children, Alga and Elmer Tryon, which the appellee could administer as guardian.    If the policy or benefit certificate was their estate, it was undoubtedly located in Tennessee, where Tryon had his domicil at the time of his death.    If the debt or obligation due on the benefit certificate was their estate, then its *locus* was in Nebraska, where the debtor corporation had its *situs*.    In either event the appellee could not draw the fund into Mississippi by attachment.    *I. C. R. R. Co.* v. *Smith,* 70 Miss., 344; *Bush* v. *Nance,* 61 Miss., 237; *Bucy* v. *K. C. M. & B. R. R. Co.,* 22 So. Rep. (Miss.), 296.

"The domicil of a legitimate or legitimated minor is, during the lifetime of his father, the same as, and changes with, the domicil of his father."    Dicey on Conflict of Laws, p. 120.

"Thirdly, minors are generally deemed incapable, *proprio marte,* of changing their domicil during their minority; and, therefore, they retain the domicil of their parents; and if the parents change their domicil, that of the infant children follows it; and if the father dies, his last domicil is that of the infant children."    Story on Conflict of Laws, sec. 46.

In *Wells* v. *Andrews,* 60 Miss., 373, where children were unlawfully removed from Tennessee to Mississippi, the court said: "They (the children) were domiciled in Tennessee, and the jurisdiction of the courts of that state over them and their estate was not destroyed by their removal, by their relatives, to Mississippi."

In such cases there is no difference between unlawful removal and unlawful detention.    The law, in effect, is that the

unauthorized interference with a child's residence does not affect the place of his domicil.

The subject-matter of this litigation is solely a check payable to appellant. This check was attached as the property of appellant. Boyle was not indebted to Griffin, either individually or as guardian. The only judgment which the court can render in an attachment suit when the complainant fails to prove that the principal defendant is indebted to him is to dismiss the suit and discharge the attachment.

'Appellant complied with the laws of Mississippi, and, as testamentary guardian, is to be preferred over appellee, who was appointed on his own application.

The record of the appointment and qualification of Boyle, as guardian, together with the certificate of the clerk of the court, as required in said act, properly authenticated under the act of congress, was filed in the office of the clerk of the chancery court of the second district of Tallahatchie county on September 18, 1902. It is true that this suit was commenced a short while prior to that date, but Boyle was not suing, but being sued, and it seems clear that the provisions of the statute have been strictly and literally complied with. He was not required to file the record, etc., before he was sued, but before he brings a suit or receives without suit property of his wards.

Furthermore, if it had been necessary for him to file the record before the suit was brought against him, that is, if the provision of the statute applied in this case, he could perfect his right by a subsequent compliance with the statute. *Grist* v. *Forehand,* 36 Miss., 69.

It is argued that our position is a collateral attack on the judgment appointing Griffin guardian in this state, and that under the decision in *Ames* v. *Williams,* 72 Miss., 760, the judgment of the chancery court cannot be attacked collaterally. We concede that if Boyle had been a party to the proceeding in which the appellee was appointed guardian, he could not

collaterally attack the appointment. But being a stranger to that proceeding, he can attack the grant of the letters in this proceeding.

"It must not, however, be understood that *all* strangers are entitled to impeach a judgment. It is only those strangers who, if the judgment were given full credit and effect, would be prejudiced in regard to some pre-existing right, that are permitted to impeach the judgment. Being neither parties to the action, nor entitled to manage the cause nor appeal from the judgment, they are by law allowed to impeach it whenever it is attempted to be enforced against them." Freeman on Judgments (4th ed.), vol. 2, sec. 335.

"An exception to the rule (against collateral attack) is stated in favor of strangers to the record whose pre-existing rights are affected, and who had no knowledge or notice of the proceedings; and such persons, having had no opportunity to reverse erroneous judgments, are accorded the privilege of calling them in question in collateral proceedings." Ency. Pl. Pr., vol. 12, p. 202.

"But this rule (against collateral attack) applies only to parties and their privies. It does not apply to such third persons or strangers to the record as would be prejudiced in regard to some pre-existing right if the judgment were given full credit and effect." *Eureka Iron and Steel Works* v. *Bresnahan,* 66 Mich., 489.

"The rule that a judgment of a court of competent jurisdiction is conclusive until reversed or in some manner set aside and annulled, and that it cannot be collaterally attacked by evidence tending to show that it was irregularly or improperly obtained, only applies to parties and privies to the judgment who may take proceedings for its reversal, and in no sense extends to strangers." *Atkinson* v. *Allen,* 12 Vt., 619.

To hold that a stranger to a judgment could not attack it in a collateral proceeding would be to deprive him of all redress whatever. *Goladar* v. *Gates,* 20 Mo., 236.

This rule is universal. *Sidensparker* v. *Sidensparker,* 52 Me., 479 (488); *Safford* v. *Weare,* 142 Mass., 231; *Vose* v. *Martin,* 4 Cush. (Mass.), 31; *Downs* v. *Fuller,* 2 Met. (Mass.), 135 (138); *Luflin* v. *Field,* 6 Met. (Mass.), 287 (289); *Gilbert* v. *Duncan,* 65 Me., 469 (475); *Caswell* v. *Caswell,* 28 Me., 232 (237); *Fall River* v. *Riley,* 140 Mass., 488; *Leonard* v. *Bryant,* 11 Met. (Mass.), 370 (373); *Hunter* v. *Cleveland Coop. Stove Co.,* 31 Minn., 505; *Ogle* v. *Baker,* 137 Pa. St., 378 (384); *Ingals* v. *Brooks,* 29 Vt., 398 (401); *Boisse* v. *Dickson,* 31 La. Ann., 741.

Griffin, the appellee, suppressed facts which would have prevented the issuance of his letters. He cannot claim that he is entitled to any priority over the appellant because his letters were issued before Boyle filed the copy of his appointment with the chancery court clerk, for, if he had disclosed what he knew, the application would have shown on its face that it was premature. He cannot take advantage of his own wrong.

*James G. McGowan,* for appellee.

The chancery court adjudicated that the wards' residence was at Water Valley, Mississippi, upon issuing the letters, and the act of the clerk was confirmed by the chancellor in term time after the filing of this suit, and before the hearing or taking of proof in this case, without exception or objection by Boyle, which if he had done successfully would have ended this litigation. So the question of their residence is *res adjudicata.*

Under our constitution the court had jurisdiction of this case, but if there could be any question at all as to this, one of the defendants without collusion paid the money into court, and asked that court to settle the question at issue.

As to collateral attack: Appellee objected to Boyle's testimony on the ground that his appointment could not be attacked collaterally in any suit by him as guardian in this state. Relying on *Ames* v. *Williams,* 72 Miss., 760, followed strictly in *Gillespie* v. *Hauenstein,* 72 Miss., 838.

Notice is unnecessary in the appointment of guardians in Mississippi, and counsel are in error when they say that three months had not expired before appellee's appointment. He was not appointed until ninety-two days after the death of Tryon, besides that question, under *Ames* v. *Williams,* cannot be raised except in the court of Griffin's appointment.

'Argued orally by *Percy Finlay,* for appellant, and *J. E. Mc-Gowan,* for appellee.

CALHOON, J., delivered the opinion of the court.

At one time there lived in this state a gentleman named Andrew E. Tryon. He was a chronic invalid. He had, at the time this record is concerned, with him his three little motherless children, the survivors of a family of five of them. He seems to have been in life, and up to the hour of his death, absolutely devoted to them, and all the time possessed with a fervent wish that they should be kept together and grow up with fraternal love and affection. Disease had for some years made work for their support impossible to him. Struggle for a livelihood had to cease, but from no fault of his own. Finally, all he had was exhausted, and he could not furnish bread for the mouths of his little ones, and they had no nest. He was destitute, and destitute with a heart filled with every generous impulse of paternal devotion to his offspring. Longing to help them, he was powerless, chained to a rock by pitiless disease, but with great and fetterless affection. A situation more distressing to a sensitive heart it is not easy to conceive. When everything had been exhausted in maintenance, and starvation was snarling at his brood, good people of Tutwiler came to their aid in such way as they could, and charity combated the wolf. In this, his dire extremity, dominated as he was by the hope of keeping his children together, he made application to the Orphans' Home, a noble charity of the Methodist Episcopal Church, established at Water Valley, Miss., to receive them

in its generous shelter for the distressed, providing in the application that his relinquishment of their custody should be "until such time as I may be able to care for them." This was dated March 25, 1902, and shows that he still hoped to recover his health and support them. This was not acted on, so far as this record shows, but on April 9, 1902, the extremity being great, a worthy clergyman of that church made and signed Mr. Tryon's name to another application to the same institution for their admission, but without Mr. Tryon's knowledge, consent or ratification. The action of this minister was from the most benevolent motives, and above criticism, because he knew of the desire of the father that the children should not be separated, and that the father was in no condition for consultation, and that immediate action was absolutely necessary. He assumed and was warranted in assuming, that, in the emergency then existing, the father could not but approve. This worthy Christian man, then, took the three children, Ada, aged 11, Algie, aged 7, and Elmer, aged 5 years, to the institution, which accepted Algie and Elmer, but refused Ada because of her ill health, and the benevolent clergyman took her back to Tutwiler, where she was cared for by charity until sent to Memphis to another Christian charitable institution known as "St. Peter's Orphan Asylum." This was at her father's wish, so that she might be near him, he being then in St. Joseph's Hospital there, under treatment, and with hope of recovery, and, without doubt, adopting Memphis as his permanent home. He had also written the Orphans' Home at Water Valley for Algie and Elmer to be sent, and with money for their fare to Memphis furnished by friends, but they were not sent, and are still at the Orphans' Home. These three children had nothing on earth except a policy of insurance in the Woodmen of the World for $2,000, the assessments and dues on which were kept up in Mr. Tryon's poverty by a big-souled man named H. B. Fitch. On May 23, 1902, Mr. Tryon made his will in Memphis, Tenn., giving the guardianship of the persons and

estate of his three children to Mr. Patrick Boyle of that city, and died five days thereafter, on May 28; 1902, with Ada only with him, and Mr. Boyle duly probated the will in Memphis on June 5, 1902, on which day letters of guardianship were duly issued to him there. The camp of the Woodmen of the World, of which Mr. Tryon was a member, was at Tutwiler, Miss., and, according to custom, that order sent the check for the $2,000 there for delivery to, and on receipt of, Patrick Boyle, guardian, and, while this check was in the hands of the proper officer of the Tutwiler camp, Mr. Griffin, who had been informed of Mr. Boyle's appointment, and had seen a copy of his letters of guardianship a month or more before, and without any notice to Boyle of his purpose, himself took out letters of guardianship of Algie and Elmer in Tallahatchie county, Miss., on August 27, 1902, less than three months (Code 1892, § 1509) from Tryon's death (Code 1892, § 2185), and on the next day filed his bill for attachment in chancery, and the court decreed that he have two-thirds of the check and Boyle one-third of it, and Boyle appeals.

Very clearly, from the evidence, Tryon's domicil was Memphis, Tenn., when he made his will, and he had a perfect right to name the guardian for his children, and he did so. His domicil being in Memphis, that also was the domicil of his children in the view of the law, and the guardian was under no legal obligation to file copies of his letters of guardianship, etc., in Mississippi before receiving a check payable to him. If he were, he did so after he had notice of Mr. Griffin's bill, which was his first knowledge that Griffin had taken out letters. *Grist* v. *Forehand,* 36 Miss., 70; Code 1892, §§ 1925, 2211. It is sufficient for Boyle, the foreign testamentary guardian, in defense of a suit for a check payable to him, to produce his appointment as testamentary guardian. Boyle was entitled to the whole check and the custody of the children.

*Reversed and decree here dismissing the bill.*