# MISSISSIPPI BAND OF CHOCTAW INDIANS *v.* HOLYFIELD ET AL.

No. 87–980.   Argued January 11, 1989—Decided April 3, 1989

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MARSHALL, BLACKMUN, O'CONNOR, and SCALIA, JJ., joined. STEVENS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and KENNEDY, J., joined, *post*, p. 54.

*Edwin R. Smith* argued the cause and filed briefs for appellant.

*Edward O. Miller* argued the cause and filed a brief for appellees.*

JUSTICE BRENNAN delivered the opinion of the Court.

This appeal requires us to construe the provisions of the Indian Child Welfare Act that establish exclusive tribal jurisdiction over child custody proceedings involving Indian children domiciled on the tribe's reservation.

## I

## A

The Indian Child Welfare Act of 1978 (ICWA), 92 Stat. 3069, 25 U. S. C. §§ 1901–1963, was the product of rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes. Senate oversight hearings in 1974 yielded numerous examples, statistical data, and expert testimony documenting what one witness called "[t]he wholesale removal of Indian children from their homes, . . . the most tragic aspect of Indian life today." Indian Child Welfare Program, Hearings before the Subcommittee on Indian Affairs of the Senate Committee on Interior and Insular Affairs, 93d Cong., 2d Sess., 3 (statement of William Byler) (hereinafter 1974 Hearings). Studies undertaken by the Association on American Indian Affairs in 1969 and 1974, and presented in the Senate hearings, showed that 25 to 35% of all Indian children had been separated from their families and placed in adoptive families, foster care, or institutions. *Id.,*

---

*Briefs of *amici curiae* urging reversal were filed for the Association of American Indian Affairs, Inc., et al. by *Bertram E. Hirsch* and *Jack F. Trope;* for the Menominee Indian Tribe of Wisconsin by *Kathryn L. Tierney;* for the Navajo Nation by *Donald R. Wharton;* and for the Swinomish Tribal Community et al. by *Jeanette Wolfley, Craig J. Dorsay,* and *Richard Dauphinais.*

at 15; see also H. R. Rep. No. 95–1386, p. 9 (1978) (hereinafter House Report). Adoptive placements counted significantly in this total: in the State of Minnesota, for example, one in eight Indian children under the age of 18 was in an adoptive home, and during the year 1971–1972 nearly one in every four infants under one year of age was placed for adoption. The adoption rate of Indian children was eight times that of non-Indian children. Approximately 90% of the Indian placements were in non-Indian homes. 1974 Hearings, at 75–83. A number of witnesses also testified to the serious adjustment problems encountered by such children during adolescence,[1] as well as the impact of the adoptions on Indian parents and the tribes themselves. See generally 1974 Hearings.

Further hearings, covering much the same ground, were held during 1977 and 1978 on the bill that became the

---

[1] For example, Dr. Joseph Westermeyer, a University of Minnesota social psychiatrist, testified about his research with Indian adolescents who experienced difficulty coping in white society, despite the fact that they had been raised in a purely white environment:

"[T]hey were raised with a white cultural and social identity. They are raised in a white home. They attended, predominantly white schools, and in almost all cases, attended a church that was predominantly white, and really came to understand very little about Indian culture, Indian behavior, and had virtually no viable Indian identity. They can recall such things as seeing cowboys and Indians on TV and feeling that Indians were a historical figure but were not a viable contemporary social group.

"Then during adolescence, they found that society was not to grant them the white identity that they had. They began to find this out in a number of ways. For example, a universal experience was that when they began to date white children, the parents of the white youngsters were against this, and there were pressures among white children from the parents not to date these Indian children. . . .

"The other experience was derogatory name calling in relation to their racial identity . . . .

. . . . .

"[T]hey were finding that society was putting on them an identity which they didn't possess and taking from them an identity that they did possess." 1974 Hearings, at 46.

ICWA.[2]  While much of the testimony again focused on the harm to Indian parents and their children who were involuntarily separated by decisions of local welfare authorities, there was also considerable emphasis on the impact on the tribes themselves of the massive removal of their children. For example, Mr. Calvin Isaac, Tribal Chief of the Mississippi Band of Choctaw Indians and representative of the National Tribal Chairmen's Association, testified as follows:

"Culturally, the chances of Indian survival are significantly reduced if our children, the only real means for the transmission of the tribal heritage, are to be raised in non-Indian homes and denied exposure to the ways of their People.  Furthermore, these practices seriously undercut the tribes' ability to continue as self-governing communities.  Probably in no area is it more important that tribal sovereignty be respected than in an area as socially and culturally determinative as family relationships."  1978 Hearings, at 193.

See also id., at 62.[3]  Chief Isaac also summarized succinctly what numerous witnesses saw as the principal reason for the high rates of removal of Indian children:

"One of the most serious failings of the present system is that Indian children are removed from the custody of their natural parents by nontribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life

[2] Hearing on S. 1214 before the Senate Select Committee on Indian Affairs, 95th Cong., 1st Sess. (1977) (hereinafter 1977 Hearings); Hearings on S. 1214 before the Subcommittee on Indian Affairs and Public Lands of the House Committee on Interior and Insular Affairs, 95th Cong., 2d Sess. (1978) (hereinafter 1978 Hearings).

[3] These sentiments were shared by the ICWA's principal sponsor in the House, Rep. Morris Udall, see 124 Cong. Rec. 38102 (1978) ("Indian tribes and Indian people are being drained of their children and, as a result, their future as a tribe and a people is being placed in jeopardy"), and its minority sponsor, Rep. Robert Lagomarsino, see ibid. ("This bill is directed at conditions which . . . threaten . . . the future of American Indian tribes . . .").

and childrearing. Many of the individuals who decide the fate of our children are at best ignorant of our cultural values, and at worst contemptful of the Indian way and convinced that removal, usually to a non-Indian household or institution, can only benefit an Indian child." *Id.*, at 191–192.[4]

The congressional findings that were incorporated into the ICWA reflect these sentiments. The Congress found:

"(3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children . . . ;

"(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

"(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people

---

[4] One of the particular points of concern was the failure of non-Indian child welfare workers to understand the role of the extended family in Indian society. The House Report on the ICWA noted: "An Indian child may have scores of, perhaps more than a hundred, relatives who are counted as close, responsible members of the family. Many social workers, untutored in the ways of Indian family life or assuming them to be socially irresponsible, consider leaving the child with persons outside the nuclear family as neglect and thus as grounds for terminating parental rights." House Report, at 10. At the conclusion of the 1974 Senate hearings, Senator Abourezk noted the role that such extended families played in the care of children: "We've had testimony here that in Indian communities throughout the Nation there is no such thing as an abandoned child because when a child does have a need for parents for one reason or another, a relative or a friend will take that child in. It's the extended family concept." 1974 Hearings, at 473. See also *Wisconsin Potowatomies of Hannahville Indian Community* v. *Houston*, 393 F. Supp. 719 (WD Mich. 1973) (discussing custom of extended family and tribe assuming responsibility for care of orphaned children).

and the cultural and social standards prevailing in Indian communities and families." 25 U. S. C. § 1901.

At the heart of the ICWA are its provisions concerning jurisdiction over Indian child custody proceedings. Section 1911 lays out a dual jurisdictional scheme. Section 1911(a) establishes exclusive jurisdiction in the tribal courts for proceedings concerning an Indian child "who resides or is domiciled within the reservation of such tribe," as well as for wards of tribal courts regardless of domicile.[5] Section 1911(b), on the other hand, creates concurrent but presumptively tribal jurisdiction in the case of children not domiciled on the reservation: on petition of either parent or the tribe, state-court proceedings for foster care placement or termination of parental rights are to be transferred to the tribal court, except in cases of "good cause," objection by either parent, or declination of jurisdiction by the tribal court.

Various other provisions of ICWA Title I set procedural and substantive standards for those child custody proceedings that do take place in state court. The procedural safeguards include requirements concerning notice and appointment of counsel; parental and tribal rights of intervention and petition for invalidation of illegal proceedings; procedures governing voluntary consent to termination of parental rights; and a full faith and credit obligation in respect to tribal court decisions. See §§ 1901–1914. The most important substantive requirement imposed on state courts is that of § 1915(a), which, absent "good cause" to the contrary, man-

---

[5] Section 1911(a) reads in full:

"An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law. Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child."

dates that adoptive placements be made preferentially with (1) members of the child's extended family, (2) other members of the same tribe, or (3) other Indian families.

The ICWA thus, in the words of the House Report accompanying it, "seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society." House Report, at 23. It does so by establishing "a Federal policy that, where possible, an Indian child should remain in the Indian community," *ibid.*, and by making sure that Indian child welfare determinations are not based on "a white, middle-class standard which, in many cases, forecloses placement with [an] Indian family." *Id.*, at 24.[6]

B

This case involves the status of twin babies, known for our purposes as B. B. and G. B., who were born out of wedlock on December 29, 1985. Their mother, J. B., and father, W. J., were both enrolled members of appellant Mississippi Band of Choctaw Indians (Tribe), and were residents and domiciliaries of the Choctaw Reservation in Neshoba County, Mississippi. J. B. gave birth to the twins in Gulfport, Harrison County, Mississippi, some 200 miles from the reservation. On January 10, 1986, J. B. executed a consent-to-adoption form before the Chancery Court of Harrison

---

[6] The quoted passages are from the House Report's discussion of § 1915, in which the ICWA attempts to accomplish these aims, in regard to nondomiciliaries of the reservation, through the establishment of standards for state-court proceedings. In regard to reservation domiciliaries, these goals are pursued through the establishment of exclusive tribal jurisdiction under § 1911(a).

Beyond its jurisdictional and other provisions concerning child custody proceedings, the ICWA also created, in its Title II, a program of grants to Indian tribes and organizations to aid in the establishment of child welfare programs. See 25 U. S. C. §§ 1931–1934.

County. Record 8–10.[7] W. J. signed a similar form.[8] On January 16, appellees Orrey and Vivian Holyfield[9] filed a petition for adoption in the same court, *id.*, at 1–5, and the chancellor issued a Final Decree of Adoption on January 28. *Id.*, at 13–14.[10] Despite the court's apparent awareness of the ICWA,[11] the adoption decree contained no reference to it, nor to the infants' Indian background.

Two months later the Tribe moved in the Chancery Court to vacate the adoption decree on the ground that under the ICWA exclusive jurisdiction was vested in the tribal court. *Id.*, at 15–18.[12] On July 14, 1986, the court overruled the mo-

---

[7] Section 103(a) of the ICWA, 25 U. S. C. § 1913(a), requires that any voluntary consent to termination of parental rights be executed in writing and recorded before a judge of a "court of competent jurisdiction," who must certify that the terms and consequences of the consent were fully explained and understood. Section 1913(a) also provides that any consent given prior to birth or within 10 days thereafter is invalid. In this case the mother's consent was given 12 days after the birth. See also n. 26, *infra*.

[8] W. J.'s consent to adoption was signed before a notary public in Neshoba County on January 11, 1986. Record 11–12. Only on June 3, 1986, however—well after the decree of adoption had been entered and after the Tribe had filed suit to vacate that decree—did the chancellor of the Chancery Court certify that W. J. had appeared before him in Harrison County to execute the consent to adoption. *Id.*, at 12–A.

[9] Appellee Orrey Holyfield died during the pendency of this appeal.

[10] Mississippi adoption law provides for a 6-month waiting period between interlocutory and final decrees of adoption, but grants the chancellor discretionary authority to waive that requirement and immediately enter a final decree of adoption. See Miss. Code Ann. § 93–17–13 (1972). The chancellor did so here, Record 14, with the result that the final decree of adoption was entered less than one month after the babies' birth.

[11] The chancellor's certificates that the parents had appeared before him to consent to the adoption recited that "the Consent and Waiver was given in full compliance with Section 103(a) of Public Law 95–608" (*i. e.*, 25 U. S. C. § 1913(a)). Record 10, 12–A.

[12] The ICWA specifically confers standing on the Indian child's tribe to participate in child custody adjudications. Title 25 U. S. C. § 1914 authorizes the tribe (as well as the child and its parents) to petition a court to invalidate any foster care placement or termination of parental rights

tion, holding that the Tribe "never obtained exclusive juris-diction over the children involved herein . . . ."  The court's one-page opinion relied on two facts in reaching that conclu-sion.  The court noted first that the twins' mother "went to some efforts to see that they were born outside the confines of the Choctaw Indian Reservation" and that the parents had promptly arranged for the adoption by the Holyfields.  Sec-ond, the court stated: "At no time from the birth of these chil-dren to the present date have either of them resided on or physically been on the Choctaw Indian Reservation."  *Id.*, at 78.

The Supreme Court of Mississippi affirmed.  511 So. 2d 918 (1987).  It rejected the Tribe's arguments that the state court lacked jurisdiction and that it, in any event, had not ap-plied the standards laid out in the ICWA.  The court recog-nized that the jurisdictional question turned on whether the twins were domiciled on the Choctaw Reservation.  It an-swered that question as follows:

> "At no point in time can it be said the twins resided on or were domiciled within the territory set aside for the reservation.  Appellant's argument that living within the womb of their mother qualifies the children's resi-dency on the reservation may be lauded for its creativ-ity; however, apparently it is unsupported by any law within this state, and will not be addressed at this time due to the far-reaching legal ramifications that would occur were we to follow such a complicated tangential course."  *Id.*, at 921.

---

under state law "upon a showing that such action violated any provision of sections 101, 102, and 103" of the ICWA.  92 Stat. 3072.  See also § 1911(c) (Indian child's tribe may intervene at any point in state-court pro-ceedings for foster care placement or termination of parental rights). "Termination of parental rights" is defined in § 1903(1)(ii) as "any action resulting in the termination of the parent-child relationship."

The court distinguished Mississippi cases that appeared to establish the principle that "the domicile of minor children follows that of the parents," *ibid.;* see *Boyle* v. *Griffin,* 84 Miss. 41, 36 So. 141 (1904); *Stubbs* v. *Stubbs,* 211 So. 2d 821 (Miss. 1968); see also *In re Guardianship of Watson,* 317 So. 2d 30 (Miss. 1975). It noted that "the Indian twins . . . were voluntarily surrendered and legally abandoned by the natural parents to the adoptive parents, and it is undisputed that the parents went to some efforts to prevent the children from being placed on the reservation as the mother arranged for their birth and adoption in Gulfport Memorial Hospital, Harrison County, Mississippi." 511 So. 2d, at 921. Therefore, the court said, the twins' domicile was in Harrison County and the state court properly exercised jurisdiction over the adoption proceedings. Indeed, the court appears to have concluded that, for this reason, *none* of the provisions of the ICWA was applicable. *Ibid.* ("[T]hese proceedings . . . actually escape applicable federal law on Indian Child Welfare"). In any case, it rejected the Tribe's contention that the requirements of the ICWA applicable in state courts had not been followed: "[T]he judge did conform and strictly adhere to the minimum federal standards governing adoption of Indian children with respect to parental consent, notice, service of process, etc." *Ibid.*[13]

---

[13] The lower court may well have fulfilled the applicable ICWA procedural requirements. But see n. 8, *supra,* and n. 26, *infra.* It clearly did not, however, comply with or even take cognizance of the substantive mandate of § 1915(a): "In any adoptive placement of an Indian child *under State law,* a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." (Emphasis added.) Section 1915(e), moreover, requires the court to maintain records "evidencing the efforts to comply with the order of preference specified in this section." Notwithstanding the Tribe's argument below that § 1915 had been violated, see Brief for Appellant 20–22 and Appellant's Brief in Support of Petition for Rehearing 11–12 in No. 57,659 (Miss. Sup. Ct.), the Mississippi Supreme Court made no reference to it, merely stating in conclusory fashion that the "minimum federal standards" had been met. 511 So. 2d, at 921.

Because of the centrality of the exclusive tribal jurisdiction provision to the overall scheme of the ICWA, as well as the conflict between this decision of the Mississippi Supreme Court and those of several other state courts,[14] we granted plenary review. 486 U. S. 1021 (1988).[15] We now reverse.

[14] See, *e. g.*, *In re Adoption of Halloway*, 732 P. 2d 962 (Utah 1986); *In re Adoption of Baby Child*, 102 N. M. 735, 700 P. 2d 198 (App. 1985); *In re Appeal in Pima County Juvenile Action No. S–903*, 130 Ariz. 202, 635 P. 2d 187 (App. 1981), cert. denied *sub nom. Catholic Social Services of Tucson* v. *P. C.*, 455 U. S. 1007 (1982).

[15] Because it was unclear whether this case fell within the Court's appellate jurisdiction, we postponed consideration of our jurisdiction to the hearing on the merits. Pursuant to the version of 28 U. S. C. § 1257(2) applicable to this appeal, we have appellate jurisdiction to review a state-court judgment "where is drawn in question the validity of a statute of any state on the ground of its being repugnant to the Constitution, treaties or laws of the United States, and the decision is in favor of its validity." It is sufficient that the validity of the state statute be challenged and sustained as applied to a particular set of facts. *Volt Information Sciences, Inc.* v. *Board of Trustees of Leland Stanford Junior University*, 489 U. S. 468, 473–474, n. 4 (1989); *Dahnke-Walker Milling Co.* v. *Bondurant*, 257 U. S. 282, 288–290 (1921). In practice, whether such an as-applied challenge comes within our appellate jurisdiction often turns on how that challenge is framed. See *Hanson* v. *Denckla*, 357 U. S. 235, 244 (1958); *Memphis Natural Gas Co.* v. *Beeler*, 315 U. S. 649, 650–651 (1942).

In the present case appellants argued below "that the state lower court jurisdiction over these adoptions was preempted by plenary federal legislation." Brief for Appellant in No. 57,659 (Miss. Sup. Ct.), p. 5. Whether this formulation "squarely" challenges the validity of the state adoption statute as applied, see *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434, 440–441 (1979), or merely asserts a federal right or immunity, 28 U. S. C. § 1257(3), is a difficult question to which the answer must inevitably be somewhat arbitrary. Since in the near future our appellate jurisdiction will extend only to rare cases, see Pub. L. 100–352, 102 Stat. 662, it is also a question of little prospective importance. Rather than attempting to resolve this question, therefore, we think it advisable to assume that the appeal is improper and to consider by writ of certiorari the important question this case presents. See *Spencer* v. *Texas*, 385 U. S. 554, 557, n. 3 (1967). We therefore dismiss the appeal, treat the papers as a petition for writ of certiorari, 28 U. S. C. § 2103, and grant the petition. (For convenience, we will continue to refer to the parties as appellant and appellees.)

## II

Tribal jurisdiction over Indian child custody proceedings is not a novelty of the ICWA. Indeed, some of the ICWA's jurisdictional provisions have a strong basis in pre-ICWA case law in the federal and state courts. See, *e. g., Fisher* v. *District Court, Sixth Judicial District of Montana,* 424 U. S. 382 (1976) *(per curiam)* (tribal court had exclusive jurisdiction over adoption proceeding where all parties were tribal members and reservation residents); *Wisconsin Potowatomies of Hannahville Indian Community* v. *Houston,* 393 F. Supp. 719 (WD Mich. 1973) (tribal court had exclusive jurisdiction over custody of Indian children found to have been domiciled on reservation); *Wakefield* v. *Little Light,* 276 Md. 333, 347 A. 2d 228 (1975) (same); *In re Adoption of Buehl,* 87 Wash. 2d 649, 555 P. 2d 1334 (1976) (state court lacked jurisdiction over custody of Indian children placed in off-reservation foster care by tribal court order); see also *In re Lelah-puc-ka-chee,* 98 F. 429 (ND Iowa 1899) (state court lacked jurisdiction to appoint guardian for Indian child living on reservation). In enacting the ICWA Congress confirmed that, in child custody proceedings involving Indian children domiciled on the reservation, tribal jurisdiction was exclusive as to the States.

The state-court proceeding at issue here was a "child custody proceeding." That term is defined to include any "'adoptive placement' which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption." 25 U. S. C. § 1903 (1)(iv). Moreover, the twins were "Indian children." See 25 U. S. C. § 1903(4). The sole issue in this case is, as the Supreme Court of Mississippi recognized, whether the twins were "domiciled" on the reservation.[16]

---

[16] "Reservation" is defined quite broadly for purposes of the ICWA. See 25 U. S. C. § 1903(10). There is no dispute that the Choctaw Reservation falls within that definition.

Section 1911(a) does not apply "where such jurisdiction is otherwise vested in the State by existing Federal law." This proviso would appear

## A

The meaning of "domicile" in the ICWA is, of course, a matter of Congress' intent. The ICWA itself does not define it. The initial question we must confront is whether there is any reason to believe that Congress intended the ICWA definition of "domicile" to be a matter of state law. While the meaning of a federal statute is necessarily a federal question in the sense that its construction remains subject to this Court's supervision, see P. Bator, D. Meltzer, P. Mishkin, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 566 (3d ed. 1988); cf. *Reconstruction Finance Corporation* v. *Beaver County*, 328 U. S. 204, 210 (1946), Congress sometimes intends that a statutory term be given content by the application of state law. *De Sylva* v. *Ballentine*, 351 U. S. 570, 580 (1956); see also *Beaver County, supra; Helvering* v. *Stuart*, 317 U. S. 154, 161–162 (1942). We start, however, with the general assumption that "in the absence of a plain indication to the contrary, . . . Congress when it enacts a statute is not making the application of the federal act dependent on state law." *Jerome* v. *United States*, 318 U. S. 101, 104 (1943); *NLRB* v. *Natural Gas Utility Dist. of Hawkins County*, 402 U. S. 600, 603 (1971); *Dickerson* v. *New Banner Institute, Inc.*, 460 U. S. 103, 119 (1983). One reason for this rule of construction is that federal statutes are generally intended to have uniform nationwide application. *Jerome, supra*, at 104; *Dickerson, supra*, at 119–120; *United States* v. *Pelzer*, 312 U. S. 399, 402–403 (1941). Accordingly, the cases in which we have

to refer to Pub. L. 280, 67 Stat. 588, as amended, which allows States under certain conditions to assume civil and criminal jurisdiction on the reservations. Title 25 U. S. C. § 1918 permits a tribe in that situation to reassume jurisdiction over child custody proceedings upon petition to the Secretary of the Interior. The State of Mississippi has never asserted jurisdiction over the Choctaw Reservation under Public Law 280. See F. Cohen, Handbook of Federal Indian Law 362–363, and nn. 122–125 (1982); cf. *United States* v. *John*, 437 U. S. 634 (1978).

found that Congress intended a state-law definition of a statutory term have often been those where uniformity clearly was not intended. *E. g., Beaver County, supra,* at 209 (statute permitting States to apply their diverse local tax laws to real property of certain Government corporations). A second reason for the presumption against the application of state law is the danger that "the federal program would be impaired if state law were to control." *Jerome, supra,* at 104; *Dickerson, supra,* at 119–120; *Pelzer,* 312 U. S., at 402–403. For this reason, "we look to the purpose of the statute to ascertain what is intended." *Id.,* at 403.

In *NLRB* v. *Hearst Publications, Inc.,* 322 U. S. 111 (1944), we rejected an argument that the term "employee" as used in the Wagner Act should be defined by state law. We explained our conclusion as follows:

> "Both the terms and the purposes of the statute, as well as the legislative history, show that Congress had in mind no . . . patchwork plan for securing freedom of employees' organization and of collective bargaining. The Wagner Act is . . . intended to solve a national problem on a national scale. . . . Nothing in the statute's background, history, terms or purposes indicates its scope is to be limited by . . . varying local conceptions, either statutory or judicial, or that it is to be administered in accordance with whatever different standards the respective states may see fit to adopt for the disposition of unrelated, local problems." *Id.,* at 123.

See also *Natural Gas Utility Dist., supra,* at 603–604. For the two principal reasons that follow, we believe that what we said of the Wagner Act applies equally well to the ICWA.

First, and most fundamentally, the purpose of the ICWA gives no reason to believe that Congress intended to rely on state law for the definition of a critical term; quite the contrary. It is clear from the very text of the ICWA, not to mention its legislative history and the hearings that led to its

enactment, that Congress was concerned with the rights of Indian families and Indian communities vis-à-vis state authorities.[17] More specifically, its purpose was, in part, to make clear that in certain situations the state courts did *not* have jurisdiction over child custody proceedings. Indeed, the congressional findings that are a part of the statute demonstrate that Congress perceived the States and their courts as partly responsible for the problem it intended to correct. See 25 U. S. C. § 1901(5) (state "judicial bodies . . . have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families").[18] Under these circumstances it is most improbable that Congress would have intended to leave the scope of the statute's key jurisdictional provision subject to definition by state courts as a matter of state law.

Second, Congress could hardly have intended the lack of nationwide uniformity that would result from state-law definitions of domicile. An example will illustrate. In a case quite similar to this one, the New Mexico state courts found exclusive jurisdiction in the tribal court pursuant to § 1911(a),

---

[17] This conclusion is inescapable from a reading of the entire statute, the main effect of which is to curtail state authority. See especially §§ 1901, 1911–1916, 1918.

[18] See also 124 Cong. Rec. 38103 (1978) (letter from Rep. Morris K. Udall to Assistant Attorney General Patricia M. Wald) ("[S]tate courts and agencies and their procedures share a large part of the responsibility" for the crisis threatening "the future and integrity of Indian tribes and Indian families"); House Report, at 19 ("Contributing to this problem has been the failure of State officials, agencies, and procedures to take into account the special problems and circumstances of Indian families and the legitimate interest of the Indian tribe in preserving and protecting the Indian family as the wellspring of its own future"). See also *In re Adoption of Halloway*, 732 P. 2d, at 969 (Utah state court "quite frankly might be expected to be more receptive than a tribal court to [Indian child's] placement with non-Indian adoptive parents. Yet this receptivity of the non-Indian forum to non-Indian placement of an Indian child is precisely one of the evils at which the ICWA was aimed").

because the illegitimate child took the reservation domicile of its mother at birth—notwithstanding that the child was placed in the custody of adoptive parents 2 days after its off-reservation birth and the mother executed a consent to adoption 10 days later. *In re Adoption of Baby Child,* 102 N. M. 735, 737–738, 700 P. 2d 198, 200–201 (App. 1985).[19] Had that mother traveled to Mississippi to give birth, rather than to Albuquerque, a different result would have obtained if state-law definitions of domicile applied. The same, presumably, would be true if the child had been transported to Mississippi for adoption after her off-reservation birth in New Mexico. While the child's custody proceeding would have been subject to exclusive tribal jurisdiction in her home State, her mother, prospective adoptive parents, or an adoption intermediary could have obtained an adoption decree in state court merely by transporting her across state lines.[20] Even if we could conceive of a federal statute under which the rules of domicile (and thus of jurisdiction) applied differently to different Indian children, a statute under which different rules apply from time to time to the same child, simply as a result of his or her transport from one State to another, cannot be what Congress had in mind.[21]

---

[19] Some details of the *Baby Child* case are taken from the briefs in *Pino* v. *District Court, Bernalillo County,* O. T. 1984, No. 84–248. That appeal was dismissed under this Court's Rule 53, 472 U. S. 1001 (1985), following the appellant's successful collateral attack, in the case cited in the text, on the judgment from which appeal had been taken.

[20] Nor is it inconceivable that a State might apply its law of domicile in such a manner as to render inapplicable § 1911(a) even to a child who had lived several years on the reservation but was removed from it for the purpose of adoption. Even in the less extreme case, a state-law definition of domicile would likely spur the development of an adoption brokerage business. Indian children, whose parents consented (with or without financial inducement) to give them up, could be transported for adoption to States like Mississippi where the law of domicile permitted the proceedings to take place in state court.

[21] For this reason, the general rule that domicile is determined according to the law of the forum, see Restatement (Second) of Conflict of Laws § 13 (1971) (hereinafter Restatement), can have no application here.

We therefore think it beyond dispute that Congress intended a uniform federal law of domicile for the ICWA.[22]

## B

It remains to give content to the term "domicile" in the circumstances of the present case. The holding of the Supreme Court of Mississippi that the twin babies were not domiciled on the Choctaw Reservation appears to have rested on two findings of fact by the trial court: (1) that they had never been physically present there, and (2) that they were "voluntarily surrendered" by their parents. 511 So. 2d, at 921; see Record 78. The question before us, therefore, is whether under the ICWA definition of "domicile" such facts suffice to render the twins nondomiciliaries of the reservation.

We have often stated that in the absence of a statutory definition we "start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used." *Richards* v. *United States*, 369 U. S. 1, 9 (1962); *Russello* v. *United States*, 464 U. S. 16, 21 (1983). We do so, of course, in the light of the "'object and policy'" of the statute. *Mastro Plastics Corp.* v. *NLRB*, 350 U. S. 270, 285 (1956), quoting *United States* v. *Heirs of Boisdoré*, 8 How. 113, 122 (1849). We therefore look both to the generally accepted meaning of the term "domicile" and to the purpose of the statute.

That we are dealing with a uniform federal rather than a state definition does not, of course, prevent us from drawing on general state-law principles to determine "the ordinary meaning of the words used." Well-settled state law can inform our understanding of what Congress had in mind when it employed a term it did not define. Accordingly, we find it helpful to borrow established common-law principles of domi-

---

[22] We note also the likelihood that, had Congress intended a state-law definition of domicile, it would have said so. Where Congress did intend that ICWA terms be defined by reference to other than federal law, it stated this explicitly. See § 1903(2) ("extended family member" defined by reference to tribal law or custom); § 1903(6) ("Indian custodian" defined by reference to tribal law or custom and to state law).

cile to the extent that they are not inconsistent with the objectives of the congressional scheme.

"Domicile" is, of course, a concept widely used in both federal and state courts for jurisdiction and conflict-of-laws purposes, and its meaning is generally uncontroverted. See generally Restatement §§ 11–23; R. Leflar, L. McDougal, & R. Felix, American Conflicts Law 17–38 (4th ed. 1986); R. Weintraub, Commentary on the Conflict of Laws 12–24 (2d ed. 1980). "Domicile" is not necessarily synonymous with "residence," *Perri* v. *Kisselbach*, 34 N. J. 84, 87, 167 A. 2d 377, 379 (1961), and one can reside in one place but be domiciled in another, *District of Columbia* v. *Murphy*, 314 U. S. 441 (1941); *In re Estate of Jones*, 192 Iowa 78, 80, 182 N. W. 227, 228 (1921). For adults, domicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there. *Texas* v. *Florida*, 306 U. S. 398, 424 (1939). One acquires a "domicile of origin" at birth, and that domicile continues until a new one (a "domicile of choice") is acquired. *Jones, supra,* at 81, 182 N. W., at 228; *In re Estate of Moore*, 68 Wash. 2d 792, 796, 415 P. 2d 653, 656 (1966). Since most minors are legally incapable of forming the requisite intent to establish a domicile, their domicile is determined by that of their parents. *Yarborough* v. *Yarborough*, 290 U. S. 202, 211 (1933). In the case of an illegitimate child, that has traditionally meant the domicile of its mother. *Kowalski* v. *Wojtkowski*, 19 N. J. 247, 258, 116 A. 2d 6, 12 (1955); *Moore, supra,* at 796, 415 P. 2d, at 656; Restatement § 14(2), § 22, Comment *c*; 25 Am. Jur. 2d, Domicil § 69 (1966). Under these principles, it is entirely logical that "[o]n occasion, a child's domicil of origin will be in a place where the child has never been." Restatement § 14, Comment *b.*

It is undisputed in this case that the domicile of the mother (as well as the father) has been, at all relevant times, on the Choctaw Reservation. Tr. of Oral Arg. 28–29. Thus, it is clear that at their birth the twin babies were also domiciled

on the reservation, even though they themselves had never been there. The statement of the Supreme Court of Mississippi that "[a]t no point in time can it be said the twins . . . were domiciled within the territory set aside for the reservation," 511 So. 2d, at 921, may be a correct statement of that State's law of domicile, but it is inconsistent with generally accepted doctrine in this country and cannot be what Congress had in mind when it used the term in the ICWA.

Nor can the result be any different simply because the twins were "voluntarily surrendered" by their mother. Tribal jurisdiction under § 1911(a) was not meant to be defeated by the actions of individual members of the tribe, for Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians. See 25 U. S. C. §§ 1901(3) ("[T]here is no resource that is more vital to the continued existence and integrity of Indian tribes than their children"), 1902 ("promote the stability and security of Indian tribes").[23] The numerous prerogatives accorded the tribes through the ICWA's substantive provisions, e. g., §§ 1911(a) (exclusive jurisdiction over reservation domiciliaries), 1911(b) (presumptive jurisdiction over nondomiciliaries), 1911(c) (right of intervention), 1912(a) (notice), 1914 (right to petition for invalidation of state-court action), 1915(c) (right to alter presumptive placement priorities applicable to state-court actions), 1915(e) (right to obtain records), 1919 (authority to conclude agreements with States), must, accordingly, be seen as a means of protecting not only the interests of individual Indian children and families, but also of the tribes themselves.

In addition, it is clear that Congress' concern over the placement of Indian children in non-Indian homes was based in part on evidence of the detrimental impact on the children

---

[23] See also *supra*, at 34, and n. 3.

themselves of such placements outside their culture.[24]   Congress determined to subject such placements to the ICWA's jurisdictional and other provisions, even in cases where the parents consented to an adoption, because of concerns going beyond the wishes of individual parents.   As the 1977 Final Report of the congressionally established American Indian Policy Review Commission stated, in summarizing these two concerns, "[r]emoval of Indian children from their cultural setting seriously impacts a long-term tribal survival and has damaging social and psychological impact on many individual Indian children."   Senate Report, at 52.[25]

---

[24] In large part the concerns that emerged during the congressional hearings on the ICWA were based on studies showing recurring developmental problems encountered during adolescence by Indian children raised in a white environment.   See n. 1, *supra*.   See also 1977 Hearings, at 114 (statement of American Academy of Child Psychiatry); S. Rep. No. 95–597, p. 43 (1977) (hereinafter Senate Report).   More generally, placements in non-Indian homes were seen as "depriving the child of his or her tribal and cultural heritage."   *Id.*, at 45; see also 124 Cong. Rec. 38102–38103 (1978) (remarks of Rep. Lagomarsino).   The Senate Report on the ICWA incorporates the testimony in this sense of Louis La Rose, chairman of the Winnebago Tribe, before the American Indian Policy Review Commission:

"I think the cruelest trick that the white man has ever done to Indian children is to take them into adoption courts, erase all of their records and send them off to some nebulous family that has a value system that is A–1 in the State of Nebraska and that child reaches 16 or 17, he is a little brown child residing in a white community and he goes back to the reservation and he has absolutely no idea who his relatives are, and they effectively make him a non-person and I think . . . they destroy him."   Senate Report, at 43.

Thus, the conclusion seems justified that, as one state court has put it, "[t]he Act is based on the fundamental assumption that it is in the Indian child's best interest that its relationship to the tribe be protected."   *In re Appeal in Pima County Juvenile Action No. S–903*, 130 Ariz., at 204, 635 P. 2d, at 189.

[25] While the statute itself makes clear that Congress intended the ICWA to reach voluntary as well as involuntary removal of Indian children, the same conclusion can also be drawn from the ICWA's legislative history.   For example, the House Report contains the following expression of Congress' concern with both aspects of the problem:

These congressional objectives make clear that a rule of domicile that would permit individual Indian parents to defeat the ICWA's jurisdictional scheme is inconsistent with what Congress intended.[26]  See *In re Adoption of Child of Indian Heritage*, 111 N. J. 155, 168–171, 543 A. 2d 925, 931–933 (1988).  The appellees in this case argue strenuously that the twins' mother went to great lengths to give birth off the reservation so that her children could be adopted by the Holyfields.  But that was precisely part of Congress' con-

---

"One of the effects of our national paternalism has been to so alienate some Indian [parents] from their society that they abandon their children at hospitals or to welfare departments rather than entrust them to the care of relatives in the extended family.  Another expression of it is the involuntary, arbitrary, and unwarranted separation of families."  House Report, at 12.

[26] The Bureau of Indian Affairs pointed out, in issuing nonbinding ICWA guidelines for the state courts, that the terms "residence" and "domicile" "are well defined under existing state law.  There is no indication that these state law definitions tend to undermine in any way the purposes of the Act."  44 Fed. Reg. 67584, 67585 (1979).  The clear implication is that state law that *did* tend to undermine the ICWA's purposes could not be taken to express Congress' intent.  There is some authority for the proposition that abandonment can effectuate a change in the child's domicile, *In re Adoption of Halloway*, 732 P. 2d, at 967, although this may not be the majority rule.  See Restatement § 22, Comment *e* (abandoned child generally retains the domicile of the last-abandoning parent).  In any case, as will be seen below, the Supreme Court of Utah declined in the *Halloway* case to apply Utah abandonment law to defeat the purpose of the ICWA.  Similarly, the conclusory statement of the Supreme Court of Mississippi that the twin babies had been "legally abandoned," 511 So. 2d, at 921, cannot be determinative of ICWA jurisdiction.

There is also another reason for reaching this conclusion.  The predicate for the state court's abandonment finding was the parents' consent to termination of their parental rights, recorded before a judge of the state Chancery Court.  ICWA § 103(a), 25 U. S. C. § 1913(a), requires, however, that such a consent be recorded before "a judge of a court of competent jurisdiction."  See n. 7, *supra*.  In the case of reservation-domiciled children, that could be only the tribal court.  The children therefore could not be made nondomiciliaries of the reservation through any such state-court consent.

cern. Permitting individual members of the tribe to avoid tribal exclusive jurisdiction by the simple expedient of giving birth off the reservation would, to a large extent, nullify the purpose the ICWA was intended to accomplish.[27] The Supreme Court of Utah expressed this well in its scholarly and sensitive opinion in what has become a leading case on the ICWA:

"To the extent that [state] abandonment law operates to permit [the child's] mother to change [the child's] domicile as part of a scheme to facilitate his adoption by non-Indians while she remains a domiciliary of the reservation, it conflicts with and undermines the operative scheme established by subsections [1911(a)] and [1913(a)] to deal with children of domiciliaries of the reservation and weakens considerably the tribe's ability to assert its interest in its children. The protection of this tribal interest is at the core of the ICWA, which recognizes that the tribe has an interest in the child which is distinct from but on a parity with the interest of the parents. This relationship between Indian tribes and Indian children domiciled on the reservation finds no parallel in other ethnic cultures found in the United States. It is a relationship that many non-Indians find difficult to understand and that non-Indian courts are slow to recognize. It is precisely in recognition of this relationship, however, that the ICWA designates the tribal court as the exclusive forum for the determination of custody and

---

[27] It appears, in fact, that all Choctaw women give birth off the reservation because of the lack of appropriate obstetric facilities there. See Juris. Statement 4, n. 2. In most cases, of course, the mother and child return to the reservation after the birth, and this would presumably be sufficient to make the child a reservation domiciliary even under the Mississippi court's theory. Application of the Mississippi domicile rule would, however, permit state authorities to avoid the tribal court's exclusive § 1911(a) jurisdiction by removing a newborn from an allegedly unfit mother while in the hospital, and seeking to terminate her parental rights in state court.

adoption matters for reservation-domiciled Indian children, and the preferred forum for nondomiciliary Indian children. [State] abandonment law cannot be used to frustrate the federal legislative judgment expressed in the ICWA that the interests of the tribe in custodial decisions made with respect to Indian children are as entitled to respect as the interests of the parents." *In re Adoption of Halloway,* 732 P. 2d 962, 969–970 (1986).

We agree with the Supreme Court of Utah that the law of domicile Congress used in the ICWA cannot be one that permits individual reservation-domiciled tribal members to defeat the tribe's exclusive jurisdiction by the simple expedient of giving birth and placing the child for adoption off the reservation. Since, for purposes of the ICWA, the twin babies in this case were domiciled on the reservation when adoption proceedings were begun, the Choctaw tribal court possessed exclusive jurisdiction pursuant to 25 U. S. C. § 1911(a). The Chancery Court of Harrison County was, accordingly, without jurisdiction to enter a decree of adoption; under ICWA § 104, 25 U. S. C. § 1914, its decree of January 28, 1986, must be vacated.

### III

We are not unaware that over three years have passed since the twin babies were born and placed in the Holyfield home, and that a court deciding their fate today is not writing on a blank slate in the same way it would have in January 1986. Three years' development of family ties cannot be undone, and a separation at this point would doubtless cause considerable pain.

Whatever feelings we might have as to where the twins should live, however, it is not for us to decide that question. We have been asked to decide the legal question of *who* should make the custody determination concerning these children—not what the outcome of that determination should be. The law places that decision in the hands of the Choctaw tribal court. Had the mandate of the ICWA been followed in

1986, of course, much potential anguish might have been avoided, and in any case the law cannot be applied so as automatically to "reward those who obtain custody, whether lawfully or otherwise, and maintain it during any ensuing (and protracted) litigation." *Halloway*, 732 P. 2d, at 972. It is not ours to say whether the trauma that might result from removing these children from their adoptive family should outweigh the interest of the Tribe—and perhaps the children themselves—in having them raised as part of the Choctaw community.[28] Rather, "we must defer to the experience, wisdom, and compassion of the [Choctaw] tribal courts to fashion an appropriate remedy." *Ibid.*

The judgment of the Supreme Court of Mississippi is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom THE CHIEF JUSTICE and JUSTICE KENNEDY join, dissenting.

The parents of these twin babies unquestionably expressed their intention to have the state court exercise jurisdiction over them. J. B. gave birth to the twins at a hospital 200 miles from the reservation, even though a closer hospital was available. Both parents gave their written advance consent to the adoption and, when the adoption was later challenged by the Tribe, they reaffirmed their desire that the Holyfields adopt the two children. As the Mississippi Supreme Court found, "the parents went to some efforts to prevent the children from being placed on the reservation as the mother arranged for their birth and adoption in Gulfport Memorial Hospital, Harrison County, Mississippi." 511 So. 2d 918, 921 (1987). Indeed, Appellee Vivian Holyfield appears before us today, urging that she be allowed to retain custody of B. B. and G. B.

---

[28] We were assured at oral argument that the Choctaw court has the authority under the tribal code to permit adoption by the present adoptive family, should it see fit to do so. Tr. of Oral Arg. 17.

Because J. B.'s domicile is on the reservation and the children are eligible for membership in the Tribe, the Court today closes the state courthouse door to her.  I agree with the Court that Congress intended a uniform federal law of domicile for the Indian Child Welfare Act of 1978 (ICWA), 92 Stat. 3069, 25 U. S. C. §§ 1901–1963, and that domicile should be defined with reference to the objectives of the congressional scheme.  "To ascertain [the term's] meaning we . . . consider the Congressional history of the Act, the situation with reference to which it was enacted, and the existing judicial precedents, with which Congress may be taken to have been familiar in at least a general way."  *District of Columbia* v. *Murphy*, 314 U. S. 441, 449 (1941).  I cannot agree, however, with the cramped definition the Court gives that term.  To preclude parents domiciled on a reservation from deliberately invoking the adoption procedures of state court, the Court gives "domicile" a meaning that Congress could not have intended and distorts the delicate balance between individual rights and group rights recognized by the ICWA.

The ICWA was passed in 1978 in response to congressional findings that "an alarmingly high percentage of Indian families are broken up by the *removal*, often unwarranted, of their children from them by nontribal public and private agencies," and that "the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families."  25 U. S. C. §§ 1901(4), (5) (emphasis added).  The Act is thus primarily addressed to the unjustified removal of Indian children from their families through the application of standards that inadequately recognized the distinct Indian culture.[1]

---

[1] The House Report found that "Indian families face vastly greater risks of involuntary separation than are typical of our society as a whole." H. R. Rep. No. 95–1386, p. 9 (1978) (hereinafter House Report).  The

·The most important provisions of the ICWA are those setting forth minimum standards for the placement of Indian children by state courts and providing procedural safeguards to insure that parental rights are protected.[2]    The Act pro-

Senate Report similarly states that the Act was motivated by "reports that an alarmingly high percentage of Indian children were being separated from their natural parents through the actions of nontribal government agencies."    S. Rep. No. 95–597, p. 11 (1977).    See also 124 Cong. Rec. 12532 (1978) (remarks of Rep. Udall) ("The record developed by the Policy Review Commission, by the Senate Interior Committee in the 94th Congress; and by the Senate Select Committee on Indian Affairs and our own Interior Committee in the 95th Congress has disclosed what almost amounts to a callous raid on Indian children.    Indian children are removed from their parents and families by State agencies for the most specious of reasons in proceedings foreign to the Indian parents"); *id.*, at 38102 (remarks of Rep. Udall) ("Studies have revealed that about 25 percent of all Indian children are removed from their homes and placed in some foster care or adoptive home or institution"); *id.*, at 38103 (remarks of Rep. Lagomarsino) ("For Indians generally and tribes in particular, the continued wholesale removal of their children by nontribal government and private agencies constitutes a serious threat to their existence as ongoing, self-governing communities"); Hearing on S. 1214 before the Senate Select Committee on Indian Affairs, 95th Cong., 1st Sess., 1 (1977) ("It appears that for decades Indian parents and their children have been at the mercy of arbitrary or abusive action of local, State, Federal and private agency officials.    Unwarranted removal of children from their homes is common in Indian communities").

[2] "The purpose of the bill (H. R. 12533), introduced by Mr. Udall et al., is to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by establishing minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes or institutions which will reflect the unique values of Indian culture and by providing for assistance to Indian tribes and organizations in the operation of child and family service programs."    House Report, at 8 (footnote omitted).    See also 124 Cong. Rec. 38102 (1978) (remarks of Rep. Udall) ("[The Act] clarifies the allocation of jurisdiction over Indian child custody proceedings between Indian tribes and the States.    More importantly, it establishes minimum Federal standards and procedural safeguards to protect Indian families when faced with child custody proceedings against them in State agencies or courts").

vides that any party seeking to effect a foster care placement of, or involuntary termination of parental rights to, an Indian child must establish by stringent standards of proof that efforts have been made to prevent the breakup of the Indian family, and that the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child. §§ 1912(d), (e), (f). Each party to the proceeding has a right to examine all reports and documents filed with the court, and an indigent parent or custodian has the right to appointment of counsel. §§ 1912(b), (c). In the case of a voluntary termination, the ICWA provides that consent is valid only if given after the terms and consequences of the consent have been fully explained, may be withdrawn at any time up to the final entry of a decree of termination or adoption, and even then may be collaterally attacked on the grounds that it was obtained through fraud or duress. § 1913. Finally, because the Act protects not only the rights of the parents, but also the interests of the tribe and the Indian children, the Act sets forth criteria for adoptive, foster care, and preadoptive placements that favor the Indian child's extended family or tribe, and that can be altered by resolution of the tribe. § 1915.

The Act gives Indian tribes certain rights, not to restrict the rights of parents of Indian children, but to complement and help effect them. The Indian tribe may petition to transfer an action in state court to the tribal court, but the Indian parent may veto the transfer. § 1911(b).[3] The Act

---

[3] The statute provides in part:

"(b) Transfer of proceedings; declination by tribal court

"In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: *Provided,* That such transfer shall be subject to declination by the tribal court of such tribe." 25 U. S. C. § 1911.

provides for a tribal right of notice and intervention in involuntary proceedings but not in voluntary ones. §§ 1911(c), 1912(a).[4]   Finally, the tribe may petition the court to set aside a parental termination action upon a showing that the provisions of the ICWA that are designed to protect parents and Indian children have been violated.   § 1914.[5]

While the Act's substantive and procedural provisions effect a major change in state child custody proceedings, its jurisdictional provision is designed primarily to preserve tribal sovereignty over the domestic relations of tribe members and to confirm a developing line of cases which held that the tribe's exclusive jurisdiction could not be defeated by the temporary presence of an Indian child off the reservation. The legislative history indicates that Congress did not intend "to oust the States of their traditional jurisdiction over Indian children falling within their geographic limits."   House Report, at 19; Wamser, Child Welfare Under the Indian Child Welfare Act of 1978: A New Mexico Focus, 10 N. M. L. Rev. 413, 416 (1980).   The apparent intent of Congress was to overrule such decisions as that in *In re Cantrell*, 159 Mont. 66, 495 P. 2d 179 (1972), in which the State placed an Indian child, who had lived on a reservation with his mother, in a foster home only three days after he left the reservation to accompany his father on a trip.   Jones, Indian Child Welfare: A Jurisdictional Approach, 21 Ariz. L. Rev. 1123, 1129 (1979).   Congress specifically approved a series of cases in which the state courts declined jurisdiction over Indian children who were wards of the tribal court, *In re Adoption of Buehl*, 87 Wash. 2d 649, 555 P. 2d 1334 (1976); *Wakefield* v. *Little Light*, 276 Md. 333, 347 A. 2d 228 (1975), or whose

---

[4] See 44 Fed. Reg. 67584, 67586 (1979) ("The Act mandates a tribal right of notice and intervention in involuntary proceedings but not in voluntary ones").

[5] Significantly, the tribe cannot set aside a termination of parental rights on the ground that the adoptive placement provisions of § 1915, favoring placement with the tribe, have not been followed.

parents were temporarily residing off the reservation, *Wisconsin Potowatomies of Hannahville Indian Community* v. *Houston*, 393 F. Supp. 719 (WD Mich. 1973), but exercised jurisdiction over Indian children who had never lived on a reservation and whose Indian parents were not then residing on a reservation, *In re Greybull*, 23 Ore. App. 674, 543 P. 2d 1079 (1975); see House Report, at 21.[6] It did not express any disapproval of decisions such as that of the United States Court of Appeals for the Ninth Circuit in *United States ex rel. Cobell* v. *Cobell*, 503 F. 2d 790 (1974), cert. denied, 421 U. S. 999 (1975), which indicated that a Montana state court could exercise jurisdiction over an Indian child custody dispute because the parents, "by voluntarily invoking the state court's jurisdiction for divorce purposes, . . . clearly submitted the question of their children's custody to the judgment of the Montana state courts." 503 F. 2d, at 795 (emphasis deleted).

The Report of the American Indian Policy Review Commission, an early proponent of the ICWA, makes clear the limited purposes that the term "domicile" was intended to serve:

"Domicile is a legal concept that does not depend exclusively on one's physical location at any one given moment in time, rather it is based on the apparent intention of permanent residency. Many Indian families move back and forth from a reservation dwelling to border communities or even to distant communities, depending on em-

---

[6] None of the cases cited approvingly by Congress involved a deliberate abandonment. In *Wakefield* v. *Little Light*, 276 Md. 333, 347 A. 2d 228 (1975), the court upheld exclusive tribal jurisdiction where it was clear that there was no abandonment. In *Wisconsin Potowatomies of Hannahville Indian Community* v. *Houston*, 393 F. Supp. 719 (WD Mich. 1973), there was no abandonment, the children had lived on the reservation and were members of the Indian Tribe, and the children's clothing and toys were at a home on the reservation that continued to be available to them. Finally, in *In re Adoption of Buehl*, 87 Wash. 2d 649, 555 P. 2d 1334 (1976), the child was a ward of the tribal court and an enrolled member of the Tribe.

ployment and educational opportunities. . . . In these situations, where family ties to the reservation are strong, but the child is temporarily off the reservation, a fairly strong legal argument can be made for tribal court jurisdiction." Report on Federal, State, and Tribal Jurisdiction 86 (Comm. Print 1976).[7]

Although parents of Indian children are shielded from the exercise of state jurisdiction when they are temporarily off the reservation, the Act also reflects a recognition that allowing the tribe to defeat the parents' deliberate choice of jurisdiction would be conducive neither to the best interests of the child nor to the stability and security of Indian tribes and families. Section 1911(b), providing for the exercise of concurrent jurisdiction by state and tribal courts when the Indian child is not domiciled on the reservation, gives the Indian parents a veto to prevent the transfer of a state-court action to tribal court.[8] "By allowing the Indian parents to

---

[7] In a letter to the House of Representatives, the Department of Justice explained its understanding that the provision was addressed to the involuntary termination of parental rights in tribal members by state agencies unaware of exclusive tribal jurisdiction:

"As you may be aware, the courts have consistently recognized that tribal governments have exclusive jurisdiction over the domestic relationships of tribal members located on reservations, unless a State has assumed concurrent jurisdiction pursuant to Federal legislation such as Public Law 83–280. It is our understanding that this legal principle is often ignored by local welfare organizations and foster homes in cases where they believe Indian children have been neglected, and that S. 1214 is designed to remedy this, and to define Indian rights in such cases." House Report, at 35.

[8] The explanation of this subsection in the House Report reads as follows:

"Subsection (b) directs a State court, having jurisdiction over an Indian child custody proceeding to transfer such proceeding, absent good cause to the contrary, to the appropriate tribal court upon the petition of the parents or the Indian tribe. Either parent is given the right to veto such transfer. The subsection is intended to permit a State court to apply a modified doctrine of *forum non conveniens*, in appropriate cases, to insure

'choose' the forum that will decide whether to sever the parent-child relationship, Congress promotes the security of Indian families by allowing the Indian parents to defend in the court system that most reflects the parents' familial standards." Jones, 21 Ariz. L. Rev., at 1141. As Mr. Calvin Isaac, Tribal Chief of the Mississippi Band of Choctaw Indians, stated in testimony to the House Subcommittee on Indian Affairs and Public Lands with respect to a different provision:

> "The ultimate responsibility for child welfare rests with the parents and we would not support legislation which interfered with that basic relationship." Hearings on S. 1214 before the Subcommittee on Indian Affairs and Public Lands of the House Committee on Interior and Insular Affairs, 95th Cong., 2d Sess., 62 (1978).[9]

that the rights of the child as an Indian, the Indian parents or custodian, and the tribe are fully protected." *Id.*, at 21.

In commenting on the provision, the Department of Justice suggested that the section should be clarified to make it perfectly clear that a state court need not surrender jurisdiction of a child custody proceeding if the Indian parent objected. The Department of Justice letter stated:

"Section 101(b) should be amended to prohibit clearly the transfer of a child placement proceeding to a tribal court when any parent or child over the age of 12 objects to the transfer." *Id.*, at 32.

Although the specific suggestion made by the Department of Justice was not in fact implemented, it is noteworthy that there is nothing in the legislative history to suggest that the recommended change was in any way inconsistent with any of the purposes of the statute.

[9] Chief Isaac elsewhere expressed a similar concern for the rights of parents with reference to another provision. See Hearing, *supra* n. 1, at 158 (statement on behalf of National Tribal Chairmen's Association) ("We believe the tribe should receive notice in all such cases but where the child is neither a resident nor domiciliary of the reservation intervention should require the consent of the natural parents or the blood relative in whose custody the child has been left by the natural parents. It seems there is a great potential in the provisions of section 101(c) for infringing parental wishes and rights").

If J. B. and W. J. had established a domicile off the reservation, the state courts would have been required to give effect to their choice of jurisdiction; there should not be a different result when the parents have not changed their own domicile, but have expressed an unequivocal intent to establish a domicile for their children off the reservation. The law of abandonment, as enunciated by the Mississippi Supreme Court in this case, does not defeat, but serves the purposes of, the Act. An abandonment occurs when a parent deserts a child and places the child with another with an intent to relinquish all parental rights and obligations. Restatement (Second) of Conflict of Laws § 22, Comment *e* (1971) (hereinafter Restatement); *In re Adoption of Halloway*, 732 P. 2d 962, 966 (Utah 1986). If a child is abandoned by his mother, he takes on the domicile of his father; if the child is abandoned by his father, he takes on the domicile of his mother. Restatement § 22, Comment *e*; 25 Am. Jur. 2d, Domicil § 69 (1966). If the child is abandoned by both parents, he takes on the domicile of a person other than the parents who stands *in loco parentis* to him. *In re Adoption of Halloway*, *supra*, at 966; *In re Estate of Moore*, 68 Wash. 2d 792, 796, 415 P. 2d 653, 656 (1966); *Harlan* v. *Industrial Accident Comm'n*, 194 Cal. 352, 228 P. 654 (1924); Restatement § 22, Comment *i*; cf. *In re Guardianship of D. L. L. and C. L. L.*, 291 N. W. 2d 278, 282 (S. D. 1980).[10] To be effective, the intent to abandon or the actual physical abandonment must be shown by clear and convincing evidence. *In re Adoption of Halloway*, *supra*, at 966; *C. S.* v. *Smith*, 483 S. W. 2d 790, 793 (Mo. App. 1972).[11]

---

[10] The authority of a State to exercise jurisdiction over a child in a child custody dispute when the child is physically present in a State and has been abandoned is also recognized by federal statute. See Parental Kidnaping Prevention Act of 1980, 94 Stat. 3569, 28 U. S. C. § 1738A(c)(2); see also Uniform Child Custody Jurisdiction Act, 9 U. L. A. § 3 (1988).

[11] The Court suggests that there could be no legally effective abandonment because the parents consented to termination of their parental rights before a judge of the state court and not a tribal court judge. *Ante*, at 51,

When an Indian child is temporarily off the reservation, but has not been abandoned to a person off the reservation, the tribe has an interest in exclusive jurisdiction. The ICWA expresses the intent that exclusive tribal jurisdiction is not so frail that it should be defeated as soon as the Indian child steps off the reservation. Similarly, when the child is abandoned by one parent to a person off the reservation, the tribe and the other parent domiciled on the reservation may still have an interest in the exercise of exclusive jurisdiction. That interest is protected by the rule that a child abandoned by one parent takes on the domicile of the other. But when an Indian child is deliberately abandoned by both parents to a person off the reservation, no purpose of the ICWA is served by closing the state courthouse door to them. The interests of the parents, the Indian child, and the tribe in preventing the unwarranted removal of Indian children from their families and from the reservation are protected by the Act's substantive and procedural provisions. In addition, if both parents have intentionally invoked the jurisdiction of the state court in an action involving a non-Indian, no interest in tribal self-governance is implicated. See *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164, 173 (1973); *Williams* v.

---

n. 26. That suggestion ignores the findings of the State Supreme Court that the natural parents did virtually everything they could do to abandon the children to persons outside the reservation: "[T]he Indian twins have never resided outside of Harrison County, Mississippi, and were voluntarily surrendered and legally abandoned by the natural parents to the adoptive parents, and it is undisputed that the parents went to some efforts to prevent the children from being placed on the reservation as the mother arranged for their birth and adoption in Gulfport Memorial Hospital, Harrison County, Mississippi." 511 So. 2d 918, 921 (1987). In any event, even a consent to adoption that does not meet statutory requirements may be effective to constitute an abandonment and change the minor's domicile. See *Wilson* v. *Pierce*, 14 Utah 2d 317, 321, 383 P. 2d 925, 927 (1963); H. Clark, Law of Domestic Relations in the United States 633 (1968).

*Lee,* 358 U. S. 217, 219–220 (1959); *Felix* v. *Patrick,* 145 U. S. 317, 332 (1892).

The interpretation of domicile adopted by the Court requires the custodian of an Indian child who is off the reservation to haul the child to a potentially distant tribal court unfamiliar with the child's present living conditions and best interests. Moreover, it renders any custody decision made by a state court forever suspect, susceptible to challenge at any time as void for having been entered in the absence of jurisdiction.[12] Finally, it forces parents of Indian children who desire to invoke state-court jurisdiction to establish a domicile off the reservation. Only if the custodial parent has the wealth and ability to establish a domicile off the reservation will the parent be able to use the processes of state court. I fail to see how such a requirement serves the paramount congressional purpose of "promot[ing] the stability and security of Indian tribes and families." 25 U. S. C. § 1902.

---

[12] The facts of *In re Adoption of Halloway,* 732 P. 2d 962 (Utah 1986), which the Court cites approvingly, *ante,* at 52–53, vividly illustrate the problem. In that case, the mother, a member of an Indian Tribe in New Mexico, voluntarily abandoned an Indian child to the custody of the child's maternal aunt off the reservation with the knowledge that the child would be placed for adoption in Utah. The mother learned of the adoption two weeks after the child left the reservation and did not object and, two months later, she executed a consent to adoption. Nevertheless, some two years after the petition for adoption was filed, the Indian Tribe intervened in the proceeding and set aside the adoption. The Tribe argued successfully that regardless of whether the Indian parent consented to it, the adoption was void because she resided on the reservation and thus the tribal court had exclusive jurisdiction. Although the decision in *Halloway,* and the Court's approving reference to it, may be colored somewhat by the fact that the mother in that case withdrew her consent (a fact which would entitle her to relief even if there were only concurrent jurisdiction, see 25 U. S. C. § 1913(c)), the rule set forth by the majority contains no such limitation. As the Tribe acknowledged at oral argument, any adoption of an Indian child effected through a state court will be susceptible of challenge by the Indian tribe no matter how old the child and how long it has lived with its adoptive parents. Tr. of Oral Arg. 15.

The Court concludes its opinion with the observation that whatever anguish is suffered by the Indian children, their natural parents, and their adoptive parents because of its decision today is a result of their failure to initially follow the provisions of the ICWA. *Ante,* at 53–54. By holding that parents who are domiciled on the reservation cannot voluntarily avail themselves of the adoption procedures of state court and that all such proceedings will be void for lack of jurisdiction, however, the Court establishes a rule of law that is virtually certain to ensure that similar anguish will be suffered by other families in the future. Because that result is not mandated by the language of the ICWA and is contrary to its purposes, I respectfully dissent.