**Janie MARCOTTE and Bruce Marcotte, Plaintiffs,**

v.

**STATE FARM FIRE & CASUALTY COMPANY, Garry L. Peterson, Charlie Bowers and Elaine Bowers, and Concordia Auto Mart, Inc., Defendants.**

No. 97–1302–JTM.

United States District Court, D. Kansas.

June 1, 1998.

Dan E. Turner, Phillip L. Turner, Turner & Turner, Topeka, KS, for Janie Marcotte, Bruce Marcotte.

Brian Wilson Wood, Hampton, Royce, Engleman & Nelson, Salina, KS, for Gary L. Peterson.

Robert Minter, Minter, Case & Zimmerman, Wichita, KS, for Charlie Bowers, Elaine Bowers, Concordia Auto Mart Inc.

Michael R. O'Neal, Gilliland & Hayes, P.A., Hutchinson, KS, for State Farm Fire & Cas. Co.

Dan E. Turner, Phillip L. Turner, Turner & Turner, Topeka, KS, for Janie Marcotte.

*MEMORANDUM ORDER*

MARTEN, District Judge.

The present action arose following the plaintiffs Janie and Bruce Marcotte's 1993 purchase of a Concordia, Kansas motel from the defendants Charlie and Elaine Bowers. At some point the Marcottes defaulted on the purchase arrangements, and on August 19, 1995, the parties contracted to terminate the prior agreement, and the Bowerses paid the Marcottes $6,000. On July 11, 1997, the Marcottes instituted the present action against the Bowerses, against State Farm Fire & Casualty Co. and Garry Peterson (an insurer of the motel and its agent), and against Concordia Auto Mart, Inc. (a business owned by the Bowerses). The complaint alleges various claims sounding under Kansas tort law including conspiracy and

fraud; there are no federal questions presented.

State Farm and Peterson (here, collectively, "State Farm") have moved to dismiss the Marcottes' claims for lack of subject matter jurisdiction. State Farm argues, with some support, that the purported relocation of the Marcottes to Nebraska was not an independent, good faith attempt to acquire a permanent residence in that state, but a collusive, transparent sham undertaken solely for the purposes of presenting the current action.

This court recently summarized the rules relating to the determination of the proper exercise of diversity jurisdiction in *Stucky v. Bates,* 2 F.Supp.2d 1434, 1436 (D.Kan.1998):

> The existence of diversity jurisdiction is usually determined from the complaint. *Whitelock v. Leatherman,* 460 F.2d 507, 514 (10th Cir.1972). However, when the allegation of diversity is challenged, the party asserting jurisdiction has the burden of proving diversity by a preponderance of the evidence. *Bair v. Peck,* 738 F.Supp. 1354, 1355 (D.Kan.1990). The court looks to the time the complaint was filed to determine whether diversity jurisdiction exists. *Freeport–McMoRan, Inc., v. K N Energy, Inc.,* 498 U.S. 426, 428, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991).
>
> For purposes of diversity jurisdiction, one is a citizen of the state in which he is domiciled. *Crowley v. Glaze,* 710 F.2d 676, 678 (10th Cir.1983). Domicile is the combination of physical presence in a location and an intent to remain there indefinitely. *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 48, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). There is a presumption favoring an established domicile over a newly acquired one. *Bair,* 738 F.Supp. at 1356. In determining where a person is domiciled, the court considers the totality of the evidence, *Cressler v. Neuenschwander,* 930 F.Supp. 1458, 1460 (D.Kan. 1996), but pays particular attention to objective indicia of intent "such as the place of employment, driver's license, automobile registration, bank accounts, tax payments, location of personal property, and voting practices." *Callicrate v. Farmland In-dus., Inc.,* 1995 WL 463664, *5 (D.Kan. 1995). Other factors to consider are the plaintiff's social attachments in both states, whether he retains a place of abode or investments in local property or enterprise in the old state of residence, whether he has taken his family and his belongings with him, and the manner in which he lives (i.e., whether he rents or, buys a home). *Cressler,* 930 F.Supp. at 1460.

The record presented to the court permits the following factual findings. Events are cited in chronological order. Unless otherwise indicated, all dates refer to the year 1997. In addition, unless otherwise indicated, "Marcotte" refers only to Janie Marcotte. There is virtually no evidence before the court as to plaintiff Bruce Marcotte's residence, employment, work history, voting records, driver's license, tax payments, etc.

Janie Marcotte registered to vote in Nebraska in January of 1997. She had been registered to vote in Kansas prior to that time, but had not voted in Kansas since 1992.

Marcotte alleges that she moved to Nebraska in June of 1997. On June 1, she signed a six-month lease with Melvin and Lorie Poppe for the property at 409 Church in Chester, Nebraska. Her husband did not sign the lease.

Marcotte's son, Colton, attended summer school in Kansas during the summer.

Marcotte is employed by Salina Regional Health Center (SRHC) in Salina, Kansas, where she has worked since March 4, 1996. Her employment is over 100 miles from her putative residence in Chester. Just before her move to Nebraska, Marcotte requested prn status at SRHC, meaning she has no regular work hours and is scheduled as needed. In August, Marcotte was paid by SRHC for working 16 hours in the first pay period of the month, and 6 hours in the second.

While Marcotte continued to work at SRHC in Kansas, she also performed some work in Chester. The objective evidence does not, however, support plaintiff's allegation that she sought full-time work in Nebraska. To the contrary, the only evidence of contemporaneous statements of intent

come from Marcotte's co-workers at Poore's in Chester, where she worked part time. According to the statement submitted by the store manager, assistant manager, and bookkeeper, Marcotte "was hired for part time work as she said she had another job which she did not want to quit." (Def.Exh. K). In October, however, Marcotte entered the assistant store manager's office

> screaming and yelling at me. . . . I tried to calm her to find out what was wrong. She said Christmas was coming and she wanted full time work. She said she quit her other job. Nobody from our company asked her to quit that job. Just a month earlier she told my store manager she did not want more hours. She told me that she had talked to her lawyer and that I was required to give her a full time job. Several times she said "JUST GET RID OF ME, JUST LET ME GO".

When the assistant manager refused to fire her, Marcotte left, only to return the next day with the same demand. The manager said her hours would be increased "as soon as possible." Marcotte told her that "it did not make any difference because she had already filed for unemployment," and left, but then returned for work the next day. At that point the store manager terminated Marcotte's employment, who, according to the statement, "smiled at the manager and said 'THANK YOU VERY MUCH.' " (Id.)

Despite the asserted June relocation, she did not renew her driver's license until September. Similarly, she waited until September 3, 1997 to tell SRHC to begin automatic payroll deposits in her bank account in Chester. Indeed, on June 11 (ten days *after* leasing the house in Chester) Marcotte had completed a form authorizing continued deposits in her account at UNB in Concordia.

On October 30, 1997, Marcotte filed an earned income verification request with the State of Nebraska Social Services which indicated she was employed by SRHC. There is no evidence Marcotte cited any other employment in her application.

The Marcottes have not sold their Kansas farm.

The defendants have introduced the statement under oath of Sharon Moravits, Janie Marcotte's sister. Moravits testified that Marcotte told her she was moving only temporarily to Nebraska because her attorney told her she needed to move out of Kansas in order for the matter to be tried in federal court. Marcotte told Moravits that she decided to live in Chester because it was on the state line, and her husband could keep his job in Concordia. Marcotte stated that she intended to rent a "little ol' rathole" in Chester, where the neighbors could not see if she was home, and that she did not intend to live there. (Moravits' statement, at 38). Marcotte also told Moravits she did not intend to stay in Nebraska but to move to Salina or to Colorado and "buy a big house" once the litigation is over. (Id., at 39).

According to Moravits, Marcotte told her that she went to Nebraska in the Spring of 1997 solely for the purpose of getting Nebraska plates for her van, to register to vote, and to get a post office box to make it look as though she was living in Nebraska. To do this, she drove by an empty house and used that address when applying for the plates, registering to vote, and signing up for a post office box. She never lived at that address. (Id. at 40).

Marcotte was "Bowler of the Month" in Salina in October.

The Marcottes have attempted to repudiate that Moravits statement by submitting an affidavit from her in February of 1998, which states that she does "not know if JANIE MORCOTTE (sic) had a house to move into in Nebraska." One of the remarkable things about this repudiation is that it is very limited about what it is repudiating—despite many detailed statements as to what Marcotte had told her, the affidavit is extremely limited in simply stating that Moravits didn't know if Marcotte had a house in Nebraska to move into. The earlier statements that Marcotte was not intending to stay in Nebraska, that the move was merely a sham undertaken at the direction of counsel, are not explicitly repudiated.

More importantly, the recent affidavit does not offer any credible explanation as to why Moravits was repudiating her earlier consis-

tent and detailed description of conversations between herself and Marcotte. To the contrary, aside from a generalized invocation of being under "extreme stress," the affidavit is entirely silent as to any legitimate reason for her complete about face. A review of the transcript of her earlier statement nullifies any suggestion that Moravits was unable to remember the conversations, or that she was being led by counsel:

MR. WOOD: Is there a reason she picked Chester?

THE WITNESS: It's right next to the line. Didn't have to go any further over. Her husband could still keep his job in Concordia and drive back and forth and feed their cows and they were in another state even if it was just a sneeze across the line.

MR. WOOD: Did she say whether she was going to move also or whether she was going to continue to live on the farm?

THE WITNESS: At the time, she said she didn't think he would move, he would probably just come up there on weekends or whatever. Then she acted like she just wanted to rent a little ol' rathole and call it their home and residence and really not stay there and she really wanted to find a place in the country where none of the neighbors could see if she was at home or not.

MR. WOOD: That's what she said?

THE WITNESS: Uh-huh, yes.

. . . .

MR. WOOD: Did she say whether she intended to stay in Nebraska?

THE WITNESS: No. As soon as this—

MR. WOOD: No, she didn't say or—

THE WITNESS: She said no, she wasn't going to stay in Nebraska. As soon as the suit was over, she wanted to move to Salina or Colorado, a bigger town that she could talk her husband into it and buy a big house.

(Moravits Statement, at 38–40).

In addition to this evidence from her sister, plaintiff Marcotte's mother, Martha Channel, has provided testimony undermining the putative Nebraska domicile. Channel testified that she attempted to visit her daughter on numerous occasions throughout the summer, only to find no one home, and the house looking as if no one lived there. The grass was uncut, the curtains and shades always drawn, and no tracks in the driveway.

In their response to the motion to dismiss, the Marcottes also rely in particular on a series of letters from Channel. The letters do indicate that Channel was attempting to obtain some compensation for telling what she knew about the events regarding both the Marcottes' operation of the motel and the move to Nebraska. But while the Marcottes characterize the letter as "blackmail," this is not evident from the text of the letter. Rather, the letter to the plaintiffs includes a demand that Marcotte pay Channel $900 for items Marcotte stole from her. There is nothing in the letter to suggest that—apart from receiving compensation for these items—Channel was attempting to obtain any additional money. A letter that was sent to defendant State Farm includes an inquiry as to whether there was a reward for the information she possessed.

The plaintiffs also offer subjective explanations of motivation (Plf. Statement of Facts ¶¶ 29 and 30). Thus, they stated they moved to Nebraska because they wanted a better house, and because they wanted to avoid continued harassment by local law enforcement. (¶ 33). They state that they have no intention of returning to Kansas (¶ 36).

██ As noted earlier, subjective statements of intent are given little credit in determining a party's domicile. Rather, the courts must look to objective indicia of a party's intent. And in that regard, the Marcottes' response does nothing to provide further support for a conclusion that the plaintiffs are residents of Nebraska. There is no evidence that Janie Marcotte has voted in Nebraska, that Bruce Marcotte has either registered to vote or voted in Nebraska. There is no evidence of utility or tax payment records. There is no evidence of professional, religious, or social connections in Nebraska. There is no evidence of moving bills.

There is no evidence the Marcottes have attempted to buy rather than rent a residence.

Given the evidence submitted by the parties, the court finds that the Marcottes have failed to meet their burden of establishing subject matter jurisdiction.

IT IS ACCORDINGLY ORDERED this 1st day of June, 1998, that the defendants' motion to dismiss is hereby granted.