Cite as 2024 Ark. App. 204

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CV-23-642

| | |
|---|---|
| CODY ELKINS AND THE CHEROKEE NATION OF OKLAHOMA | Opinion Delivered March 13, 2024 |
| APPELLANTS | APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT [NO. 66FJV-21-352] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE DIANNA HEWITT LADD, JUDGE |
| APPELLEES | REVERSED AND REMANDED |

**WAYMOND M. BROWN, Judge**

Appellants Cody Elkins and the Cherokee Nation of Oklahoma (Cherokee Nation) appeal from the Sebastian County Circuit Court's permanency-planning order and the subsequent order terminating Elkins's parental rights to his son, M.C., born on November 30, 2018. Appellants argue that the circuit court's decision to change the case's goal following the permanency-planning hearing (PPH) to solely adoption after termination was premature under the Indian Child Welfare Act's (ICWA's) protections. They also argue that the circuit court erred in denying a placement hearing for months, contrary to state law, requiring that placement be considered every six months and following through with the termination hearing. Finally, appellants argue that the termination order should be reversed because it was not in M.C.'s best interest. We reverse and remand.

M.C. was taken into the custody of Arkansas Department of Human Services (DHS) on October 5, 2021, while M.C. was living with his mother, Siearra Vaun Tucker-Trammel, who threatened to kill herself and M.C., tried to run away from family members with M.C., subsequently jumped out of a vehicle on her way to seek treatment for suicidal and homicidal ideation, and did not participate in mental-health treatment. Additionally, M.C. was found to have bruising inconsistent with the history provided by Tucker-Trammel. DHS filed a petition for dependency-neglect and emergency custody on October 7, and the circuit court entered an ex parte order for emergency custody that same day.[1] The circuit court subsequently found probable cause existed for DHS to remove M.C. from Tucker-Trammel and continued to exist so that it was in the best interest of M.C. to remain in DHS's custody.

M.C. was adjudicated dependent-neglected in an order filed on December 20. The circuit court specifically found that M.C. was at substantial risk of serious harm as a result of neglect and parental unfitness that was caused by Tucker-Trammel at the time of DHS's involvement.

On March 3, 2022, DHS gave notice to the Cherokee Nation of the custody proceeding involving M.C., an Indian child, and advising it of its right to intervene. A paternity test filed on March 25 showed that appellant Elkins is M.C.'s father. The Cherokee Nation responded on March 28, verifying that M.C. is an Indian child and requiring that all the safeguards of the federal ICWA be applied.

_____

[1]Elkins was incarcerated at the time of M.C.'s removal.

The circuit court filed a review order on April 26, finding that M.C.'s parents were not in compliance with the case plan. The Cherokee Nation filed a notice of intervention on April 28 and a second notice was filed on May 3. An attorney was appointed to Elkins on May 27. The circuit court filed a review order and an order establishing paternity on August 8. In that order, the circuit court found that based on the testimony regarding ICWA compliance by Cherokee Nation's representative, Renee Gann, M.C. "should remain with the department and that return of [M.C.] to the parents would likely result in serious emotional or physical damage[.]" The circuit court also found that, although M.C.'s current placement was not ICWA compliant, it "was the least restrictive and in the best interest of [M.C.] and that the Department had made active efforts to prevent the breakup of the Indian family." DHS was ordered to continue to make active efforts to reunify the family. The circuit court continued the concurrent goal of reunification along with adoption following termination. DHS was also ordered to provide copies of the ICPC home study to all attorneys upon receipt from Oklahoma. The circuit court indicated that it was not moving forward with the ICPC placement prior to the start of play therapy and the subsequent recommendation for M.C. The circuit court found that there should be no sibling visitation between M.C. and his siblings at the time. The circuit court found that Elkins was presently incarcerated in a facility where services are not provided. Elkins was ordered to immediately begin completion of services when he is released to a facility that provides services and to work the case plan and comply with the circuit court's orders. A permanency planning hearing (PPH) was scheduled for October 18.

The PPH took place as scheduled. During preliminary matters, Bridgett Cornett, a family service worker in foster care for DHS, testified that other than DNA testing, Elkins had not completed any services in connection with this case. She indicated that the ICPC process had been started but was held up because DHS was transitioning between ICPC workers and "it got lost with them." As a result, the documentation had to be resent, and since the grandparents had moved to a new residence at that time, it was further held up. She further testified, "[T]here is another case that has a sibling and Oklahoma is using those ICPC results from those home studies, from the background checks, everything that they are doing, and they will apply it to this ICPC instead of conducting other new things that go with them." However, she testified that it was not yet complete. She said that it was DHS's intention to move forward with ICPC placement. She stated that DHS was recommending that reunification services continue to be offered. She testified that Oklahoma will send the ICPC results to DHS once it has been completed, regardless of whether it is approved. She stated that the home study was conducted on Chandra Reed, the paternal grandmother. She said that M.C. has two half siblings and one full blooded sibling and that the half siblings are the subject of the ICPC in Oklahoma. She stated that M.C. has been visiting with Reed and her husband via Zoom.

Gann testified that the Cherokee Nation's position at the beginning of a case is reunification. She stated that as far as placement, they first prefer extended family members, second, a home designated by the child's tribe, and third, a home of another federally recognized tribe. She indicated that she had communicated the preferences to DHS and

4

that she was aware of DHS's plan to pursue the ICPC placement with M.C.'s grandparents. She testified that DHS's plan complied with the federal guidelines and that DHS was making active efforts to try to reunify the family. She asked that DHS continue to look at relative placement in an ICWA-compliant placement. Gann also acknowledged that there were other Indian family members that DHS was looking at. She stated that the Cherokee Nation does not perform its own home study for placements, especially if the homes are in ICPC. She stated that they accept the ICPC studies and review them. Gann stated that the Cherokee Nation did not have a problem with M.C.'s therapist making a recommendation before M.C. could be moved to an ICPC placement.

As Heather Olsen, M.C.'s therapist, was being questioned about whether it was necessary for her to meet the grandparents in the Oklahoma ICPC before she could make a recommendation about M.C.'s living with them, M.C.'s attorney ad litem, Robert Kelly, objected to the line of questioning, contending that it was "predicated on a future event," the parties did not know whether it was going to even happen, and the therapist's statement was "speculative." He further argued that the testimony was not relevant and contended that they were getting into "some shaky area" and that they first needed to get the ICPC home study back. DHS stated that based on Gann's testimony about relative placement, it was moving forward to accomplishing that goal. Olsen was subsequently withdrawn as a witness.

Gann testified that return of M.C. to either of his parents at this time would most likely result in serious emotional and/or physical damage to M.C. Gann stated that,

although M.C.'s current placement was not ICWA compliant, the Cherokee Nation did not object to it because it was the least restrictive and in M.C.'s best interest at that time. She opined that M.C. could not return home to his parents within the next ninety days.

At the conclusion of the hearing, DHS recommended that the case's goal remain reunification with a concurrent goal of adoption following termination. Elkins's attorney indicated that Elkins wanted M.C. returned to Tucker-Trammell "while he works out his situation." He asked, alternatively, that Elkins's parents be considered as a placement for M.C. He also asked for visitation with M.C., even though Elkins was still incarcerated. The attorney informed the circuit court that it was his understanding that the grandparents' ICPC home study had been approved. The ad litem requested that M.C. remain in DHS's custody. He stated that the parents had not proved by a preponderance of the evidence that they had made any significant, measurable progress toward remedying the conditions that caused removal, and as such, he opined that the case's goal should be adoption following termination. He further stated:

> With regard to some of the arguments that were made by counsel, relative placements are a preference in the state of Arkansas, but they're not mandatory. It is what's in . . . the best interest of a child. It's what's in the best interest of a child based on their age, based on their sense of development, their sense of belonging, their attachments. There's [sic] various factors that are listed out with regard to what's in the child's best interests, but just because there are relatives out there, does not mean that it's in the child's best interest to be placed there.
>
> And so, I think the Court has wisely, judiciously chosen to move with caution, particularly with the placement of [M.C.], based on the ICPC home study. And I would ask that the Court continue its order that no placement occur, based on that ICPC home study, without the involvement and the recommendation of the therapist or [M.C.'s] therapist specifically.

Elkins's attorney reminded the circuit court that the issues concerning termination or allowing M.C. to be placed with his grandparents were ultimately the circuit court's call, regardless of the therapist's recommendation. The circuit court orally announced that the case's goal would remain reunification with a concurrent goal of adoption following termination of parental rights. It found that the parents had failed to prove they had made significant, measurable progress in remedying the conditions that caused removal and noted that Elkins had done nothing in terms of complying with the case except for the DNA test. It found that return of custody to the "parent or the Indian custodian is likely to result in serious emotional or physical damage to [M.C.]." The circuit court also declined to grant any Zoom visits between Elkins and M.C.[2] It reiterated that "no placement shall occur pursuant to the ICPC that's currently in process, out of that prior Tulsa, Oklahoma ICPC home study, without the involvement and recommendation of [M.C.'s] therapist." Elkins's attorney then asked the circuit court if it could add a third goal of relative placement since the circuit court mentioned the Tulsa situation. The circuit court declined to address the question, stating,

> [The] ICPC study was talked about and testified at the ~ at the ju ~ let me ~ hang on ~ ~ at that July 26th hearing, almost identically like it was today, by Ms. Cornett. It was almost virtually the exact same testimony. Not much had changed at all. It is still in the works today, like it was in the works in July. It is something that is to be considered. It is ~ it is ~ I didn't hear anything different. It's out there. It's being processed by the Department as a consideration, as a possible future placement consideration. There's – it's just out there, Mr. Arnold. There's nothing to be

---

[2]When in-person visitation was being discussed, Elkins stated that he did not want to put M.C. through that.

7

considered yet. When it happens, the therapist is – it's my order that the therapist will be involved. There will be a staffing. It's ~ there ~ the therapist will be involved, and there will be a recommendation by the therapist, and we'll go from there.

. . . .

I'm not laying the ultimate decision making on the therapist. It – there's just going to be a recommendation that I'll consider.

The permanency-planning order was filed on October 25 in which the circuit court made its findings by a preponderance of the evidence. The order reiterated the circuit court's oral ruling; however, the order listed only one case goal--adoption following termination.

DHS filed a petition for the termination of parental rights on December 1, 2022. On January 27, 2023, M.C.'s foster parents filed a motion to intervene in the action and a motion for the circuit court to find good cause to deviate from the placement preferences of the ICWA. DHS filed an amended petition for the termination of parental rights on February 2. A second amended petition was filed on February 3. DHS responded to the motion to intervene on February 7, asking the circuit court to deny it. The ad litem responded to both motions on February 17; as for intervention, it asked that any decision concerning placement be held in abeyance until after termination of parental rights, set for April 18, and addressed in a separate hearing. In response to the good-cause motion, it stated that the foster parents should "provide a more definite statement of their intentions in seeking to intervene in this matter." It again asked the circuit court to hold any decision in abeyance pending the conclusion of the termination hearing.

The circuit court filed an order on March 15, granting the foster parents the right to intervene. An attorney for the Cherokee Nation entered her appearance on April 13. On April 14, the Cherokee Nation filed a motion for a continuance of the termination hearing and a motion for a placement hearing. In the motion, the Cherokee Nation informed the circuit court that since the last hearing, a member of its nation, who is also a relative of M.C. and the foster-care placement of M.C.'s siblings, had been approved for placement by the State of Oklahoma through an ICPC home study. It noted that the circuit court ordered that M.C. could not be moved from his current placement without a court order. It stated that the placement and continued contact with the Cherokee Nation tribal family and biological family is of paramount concern to the Cherokee Nation and is of the most paramount concern for the best interest of M.C. and for the preservation of M.C. with his Native American family than a termination hearing. It further stated that it did not believe that it was in M.C.'s best interest to lose the legal status of his biological and Native American relatives at a termination hearing prior to ensuring the protection and preservation of the Native American family as a result of state law, even if federal protections remain. The Cherokee Nation asked that the termination hearing set for April 18 be changed to a placement hearing instead. The circuit court filed an order on April 14 granting the Cherokee Nation's motion.

The circuit court held a review hearing on April 18 and accepted the Oklahoma ICPC home study into evidence. The circuit court subsequently agreed that the hearing was a placement hearing. The circuit court took testimony and allowed the foster parents to

actively participate in the hearing. The hearing lasted longer than anticipated, and the circuit court stated that it would provide the parties with another date in which to finish. The hearing resumed on April 25. Prior to the beginning of the hearing, the Cherokee Nation moved for reconsideration and for a corrected order. In the motion, the Cherokee Nation asked that the order granting the foster parents a right to intervene be set aside and that the circuit court enter a corrected permanency-planning order indicating that the case's goal remained reunification with a concurrent goal of adoption following termination. The circuit court heard responses from all the parties and then ordered that the intervening issue be briefed. A new hearing date of June 6 was scheduled.

The ad litem filed a petition for termination of parental rights on April 27. It alleged several grounds to support the termination of Elkins's parental rights: (1) twelve months, failure to remedy; (2) willfully failing to provide significant material support or maintain meaningful contact; (3) subsequent factors; (4) aggravated circumstances; and (5) sentenced in a criminal proceeding for a period of time that would constitute a substantial period of M.C.'s life. The foster parents' attorney filed a letter on May 2 conceding that his clients could not intervene.

The Cherokee Nation filed a prehearing brief on June 5 outlining the purpose of ICWA and its regulations. It also outlined the placement preferences applied in foster-care or pre-adoptive placements as outlined in 25 CFR § 23.131 (b), which listed in order of preference that must be followed (1) a member of the Indian child's extended family; (2) a foster home that is licensed, approved, or specified by the Indian child's tribe; (3) an Indian

foster home licensed or approved by an authorized non-Indian licensing authority; or (4) an institution for children approved by an Indian tribe or operated by an Indian organization that has a program suitable to meet the child's needs. The Cherokee Nation maintained that M.C. should be placed with his extended family, the Reeds, so that he can grow up with his five-year-old sibling, Minor Boy (M.B.). According to the Cherokee Nation, M.B. was placed with the paternal grandparents on or about December 31, 2022, pursuant to the same ICPC home study that was received on October 27, regarding M.C. The Cherokee Nation stated that the ICPC study contemplated both M.C. and M.B. residing together with the Reeds and that, according to the ICPC progress report, M.B., the Reeds, and the other children placed there are doing well and has not been disrupted. The Cherokee Nation reminded the circuit court that it could only depart from the placement preference following a determination of good cause, which must be made on the record or in writing, according to 25 C.F.R § 25.132. The Cherokee Nation noted that it had not identified a single basis for the circuit court to deviate from the first preferred placement. The Cherokee Nation also asked the circuit court to follow this state's law as it relates to preferences as outlined in Arkansas Code Annotated section 9-27-355, calling for preferential consideration to be given for placement if the relative meets all relevant protective standards and it is in the best interest of the child to be placed with the relative or fictive kin. It also noted that this preferential consideration should be given at all stages of the case and that the statute requires the circuit court to make specific findings in writing regarding the considerations given if the circuit court denies placement with a relative. The Cherokee Nation also stated

11

that the statute prevents the circuit court from basing its decision to place the child solely upon consideration of the relationship formed between the child and a foster parent. The Cherokee Nation cited *Ellis v. Arkansas Department of Human Services*,[3] to show that the state law preference for placement with relatives should be applied. The Cherokee Nation also cited other cases and asked that the issue of relative placement be addressed before the termination of parental rights. The ad litem sent an email on June 5 stating that it intended to proceed on its petition for the termination of parental rights on June 6, despite the recent motions filed by the Cherokee Nation in response to an email by the Cherokee Nation inquiring about the nature of the June 6 hearing. The circuit court sent an email later that day granting the ad litem's request to proceed on its termination petition.

The Cherokee Nation objected to the circuit court's proceeding with the termination hearing since the record on the April hearings had not been closed and the circuit court failed to follow the statutory requirement that a review hearing be held every six months. Additionally, the Cherokee Nation argued that the termination hearing should not come before a decision on placement. DHS agreed that if termination took place first, M.C.'s family would lose the preference given it via the ICWA. Elkins's attorney asked that the circuit court consider guardianship with the parental grandparents instead of termination so that M.C. could be with his siblings. The ad litem disagreed with the arguments and stated that he had been involved in several cases in which a child was adopted by a relative following

---

[3]2016 Ark. 441, 505 S.W.3d 678.

termination of parental rights. The circuit court ruled that the termination would take place first, and if time permitted, the placement hearing would follow.

Cornett testified that it was DHS's recommendation that termination of parental rights be granted and for M.C. to be placed for adoption in a relative placement. She stated that termination of parental rights was in M.C.'s best interest. She said that as far as placement preferences are concerned, DHS prefers to place a child with relatives, first, or with their siblings, second. She testified that even after termination, DHS will consider relatives as a placement.

Elkins testified that he is currently incarcerated and serving a five-year prison sentence for possession of stolen merchandise, possession of methamphetamine and cocaine, possession of drug paraphernalia, and second-degree forgery. He also stated that he is subjected to 135 years' suspended sentence. He said that he is at the Mississippi County Work Release Center, where he has been for the past five months. He stated that he was looking forward to being paroled in November. He acknowledged that the Arkansas Department of Correction does offer certain classes; however, he stated that the work-release program he is in does not offer the classes. He said that he has three other children who are with his mother, one of which is M.C.'s whole sibling, and two are M.C.'s half siblings. He opined that it is in M.C.'s best interest to be placed with the Reeds, where M.C.'s other siblings are. Elkins said that he applied to the work-release program because he believed that the program would help him get out of prison quicker and allow him to do the things required to get his children back.

Gann testified that Elkins has not completed any services. She agreed that DHS had made active efforts to prevent the breakup of the Indian family. Gann admitted that M.C. could not be returned to Elkins at that time; however, she stated that there should be a permanent plan for M.C. before parental rights are terminated. She also said that they were asking the circuit court to follow the first placement preference under ICWA because there is an appropriate relative. She reiterated the Cherokee Nation's objection to the termination of parental rights. Gann testified that return of M.C. to either parent would result in serious physical or emotional harm to him. She stated that she did not recall ever testifying in a proceeding and recommending termination where the Indian child was not in a permanent placement. Gann told the circuit court that the Cherokee Nation did not object to M.C.'s placement in October because it was the least restrictive at the time since the ICPC home study had not yet been approved. However, she stated that after the approved home study, it was the Cherokee Nation's recommendation that M.C. be placed with his relative and other siblings. She said that this was not only the federal law but it was also in M.C.'s best interest. She stated that the Cherokee Nation's permanency plan for M.C. if parental rights are terminated is to be placed with a relative.

The ad litem asked the circuit court to find beyond a reasonable doubt that termination is in M.C.'s best interest. DHS agreed that termination was the right outcome; however, it indicated that it disagreed with how they got there. Tucker-Trammell voluntarily relinquished her parental rights at the hearing. Elkins's attorney asked that the termination petition be denied and that M.C. be placed with his siblings. The Cherokee Nation's

14

attorney argued that termination was not in M.C.'s best interest and that M.C. should be placed with his relative prior to any termination determination. The attorney also argued that M.C. was not provided with the protections requiring that his placement be reviewed every six months, since the last hearing took place in October. The ad litem argued that the Cherokee Nation did not have cleans hands because it was the motion filed by it that changed the original termination hearing into a placement hearing. The Cherokee Nation's attorney responded that, either way, there had not been a complete hearing on M.C.'s placement since October. The circuit court informed the parties that it would issue a decision about termination before the scheduled placement hearing of June 13. The circuit court filed a letter opinion on June 9 finding beyond a reasonable doubt that termination should be granted based on all grounds alleged by the ad litem.

The ad litem responded to the Cherokee Nation's prehearing brief on June 9 stipulating that the ICWA law set out in the Cherokee Nation's brief was accurate. However, the ad litem argued that the Cherokee Nation was estopped from claiming that M.C.'s bonding with his foster parents cannot be used as a reason to deviate from the placement preferences and that the circuit court is not limited to the five preferences listed in 23 CFR § 25.132 in determining whether good cause exits to depart from the placement preferences of ICWA. The ad litem also contended that the circuit court should deem the April 18 and 25 hearings a nullity and proceed with the June 13 placement hearing.

The termination order, filed on June 27, granted the ad litem's petition to terminate Elkins's parental rights on all grounds alleged. The order stated that the circuit court found

beyond a reasonable doubt that termination was in M.C.'s best interest considering his adoptability and the potential harm he would face if returned to his parents. The circuit court specifically found that return of M.C. "to the parent or Indian custodian is likely to result in serious emotional or physical damage to [M.C.] . . . and Mr. Elkins remains incarcerated." Elkins and the Cherokee Nation filed timely notices of appeal. The circuit court entered an order on July 18 outlining the case history. In this order, the circuit court stated that it had "set aside the Order for placement hearing and ruled that the placement hearing that initially began on April 18, 2023, was a nullity such that the Court will not consider evidence or testimony presented."[4] Appellants timely filed amended notices of appeal to include the July 17 order.

Both appellants argue some variation that the circuit court erred by changing the goal following the PPH to solely adoption following termination of parental rights without first considering a goal of relative placement.[5] Our review from a permanency-planning hearing is de novo, and we will not reverse unless the circuit court's findings are clearly erroneous.[6]

---

[4]We cannot find anywhere in the record where the circuit court made such a finding other than the statement in this order.

[5] The ad litem incorrectly argues that appellants' appeal of the permanency-planning order is untimely or somehow waived. Appellants timely included the permanency-planning order and the transcript from that hearing in their notices of appeal. Therefore, an appeal from that order is properly before us. *See Gyalog v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 302, 461 S.W.3d 734.

[6]*Yelvington v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 337, 580 S.W.3d 874.

As to issues of law, however, we give no deference to the circuit court.[7] Ordinarily, the burden of proof in a PPH is a preponderance of the evidence.[8] However, if the ICWA applies, the burden is clear and convincing evidence.[9]

Congress passed the ICWA in response to the "rising concern in the mid-1970s over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes."[10] The ICWA applies to all state child-custody proceedings involving an Indian child when the court knows or has reason to know an Indian child is involved.[11] "Child custody proceeding" means, and includes, foster care placement, termination of parental rights, preadoptive placement, and adoptive placement.[12] An Indian child is defined by the ICWA as an "unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a

---

[7]*Gould v. Gould*, 2023 Ark. App. 118, 662 S.W.3d 676.

[8]Ark. Code Ann. § 9-27-325(h)(2)(A)(ii) (Supp. 2023).

[9]Ark. Code Ann. § 9-27-325(h)(2)(B)(i).

[10]*Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989).

[11]25 U.S.C.A. § 1912(a) (WL current through P.L. 118-39).

[12]25 U.S.C.A. § 1903(1) (WL current through P.L. 118-39).

member of an Indian tribe."[13] Congress has stated that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children."[14]

When a state court adjudicates child-custody proceedings involving Indian children, ICWA governs from start to finish.[15] Pursuant to the ICWA, in any foster-care or preadoptive placement of an Indian child under state law, where the Indian child's tribe has not established a different order of preference under a separate part of this section, preference must be given, in descending order to the following: (1) a member of the Indian child's extended family; (2) a foster home that is licensed, approved, or specified by the Indian child's tribe; (3) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or (4) an institution for children approved by an Indian tribe operated by an Indian organization that has a program suitable to meet the child's needs.[16] The court must, where appropriate, also consider the preference of the Indian child's parent.[17] ICWA requires state courts to place an Indian child with an Indian caretaker, if

---

[13]25 U.S.C.A. § 1903(4).

[14]25 U.S.C.A. § 1901(3) (WL current through P.L. 118-39); *Haaland v. Brackeen*, 599 U.S. 255 (2023) (where U.S. Supreme Court upheld the constitutionality of certain ICWA provisions).

[15]Haaland, supra.

[16]25 C.F.R. § 23.131(b).

[17]25 C.F.R. § 23.131(d).

one is available; that is so even if the child is already living with a non-Indian family and the state court thinks it's in the child's best interest to stay there.[18]

No one challenges the circuit court's finding that the non-ICWA compliant placement of M.C. with his foster parents was the least-restrictive placement at the time of the PPH. However, appellants argue that since the circuit court was aware of the pending ICPC home study of M.C.'s paternal grandparents, it should have taken that information into account and made relative placement part of the case's goal instead of just adoption following termination. The evidence adduced at the PPH showed that, although there was an ICPC home study being performed, it had not yet been completed. One reason for the delay was due to changes in DHS's staff, causing documents to be lost in the process and leading to new documents having to be sent; also, by that time, the grandparents had moved. DHS stated that it was its intention to move forward with ICPC placement; however, the ad litem spoke against placing M.C. without the recommendation of his therapist. Gann, speaking for the Cherokee Nation, also informed the circuit court that M.C. should ultimately be placed with his extended relatives. The circuit court found by a preponderance of the evidence that adoption following termination of parental rights should be the case's sole goal.

Appellants cite *Ellis*,[19] for their proposition that the circuit court erred in changing the case's goal to solely adoption following termination. In *Ellis*, the father appealed a

---

[18] 25 U.S.C.A. §§ 1901 et seq.; *Haaland, supra.*
[19] *Supra.*

permanency-planning order that denied his motion to consider placing his child with his brother, the child's uncle. The circuit court refused to consider the uncle's satisfactory home study, although DHS had recommended that the child be placed with the uncle. Instead, the circuit court ordered that the child remain in the foster home and changed the case goal to adoption. On appeal, the father argued that the court's refusal to place the child with the uncle violated the state's public policy to preserve and strengthen the juvenile's family ties when it is in the child's best interest. Our supreme court agreed with the father and held that the circuit court erred when it did not consider the home study and did not apply the statutory preference for relative placement given the completed and satisfactory relative home study. Here, it must be noted that *Ellis* was not an ICWA case, but its rationale still holds true for the issues presented in this case. While the home study in this case had not yet been approved at the time of the PPH, the evidence showed that there were relatives willing to take custody of M.C. upon approval of the home study, which was held up by no fault of appellants or the extended family. The same relatives already had custody of M.C.'s siblings from a separate juvenile case and were already enjoying visitation with M.C. via Zoom. Additionally, everyone except the ad litem felt that M.C. should ultimately be placed in his grandparents' custody. The circuit court found by a preponderance of the evidence that the goal should be changed to solely adoption following termination.[20] We hold that

---

[20]We must note that this was the incorrect burden of proof as required under the statute when dealing with ICWA cases. *See* Ark. Code Ann. § 9-27-325(h)(2)(B)(1) (requiring the burden of proof in a permanency-planning hearing involving the ICWA to be by clear and convincing evidence).

the circuit court clearly erred by changing the case's goal to solely adoption following termination in contravention of the preferences mandated by the ICWA. Accordingly, we reverse and remand the permanency-planning order for the circuit court to follow the standards as required under the ICWA and to enter an order consistent with this opinion. Because we reverse and remand on this issue, we necessarily also reverse any subsequent orders entered by the circuit court in this case.[21]

Reversed and remanded.

KLAPPENBACH and HIXSON, JJ., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for separate appellant Cody Elkins.

*Dusti Standridge*, for separate appellant Cherokee Nation.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.

---

[21]We do not reach appellants' other issues on appeal because we are reversing and remanding at the permanency-planning stage.