Filed 5/1/26  In re A.D. CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.D., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E087527 |
| Plaintiff and Respondent, | (Super.Ct.No. J292183) |
| v. | OPINION |
| J.D., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Conditionally reversed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Laura Feingold, County Counsel, and David R. Guardado, Deputy County Counsel, for Plaintiff and Respondent.

1

## INTRODUCTION

Jeremiah D. (Father) appeals following the termination of his parental rights over his daughter, A.D. The sole issue Father raises on appeal is that there was insufficient evidence to support the juvenile court's finding that the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) did not apply. Father contends the San Bernardino County Children and Family Services (CFS) failed to conduct a sufficient "further inquiry" into A.D.'s Native American ancestry, as required under Welfare and Institutions Code[1] section 224.2, subdivision (e), and failed to provide sufficient documentation from which the court could determine that ICWA did not apply.

We agree. We conditionally reverse the order terminating Father's parental rights and remand for CFS to fully comply with its inquiry and documentation obligations under section 224.2 and California Rules of Court,[2] rule 5.481.

## BACKGROUND

In February 2022, Father lived with Jessica H. (Mother), their two infant children, A.D. (born 2021) and X.D. (born 2019), Mother's four children from a prior relationship, E.S. (born 2008), A.H. (born 2010), An.H. (born 2012), and C.H. (born 2014), and a few paternal relatives. Following a report of physical and emotional abuse related to Mother's four older children, CFS obtained a detention warrant and removed all six children from the home.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

[2] All further rule references are to the California Rules of Court.

On February 15, 2022, CFS filed dependency petitions on behalf of the children. As to Father's children, A.D. and X.D., the petitions alleged serious physical harm, failure to protect, and abuse of siblings. (§ 300, subds. (a), (b)(1), & (j).) It was alleged that Mother and Father used excessive discipline and physically abused the four older children by spanking them with objects and forcing them to stand in the corner for several hours at a time, and had caused serious emotional damage to E.S., which placed A.D. and X.D. at a substantial risk of physical or emotional harm.

The juvenile court ordered A.D. and X.D. detained from both parents and later sustained the petitions. At the disposition hearing, the court found Father to be the presumed father of A.D. and X.D., declared the children dependents, and ordered family reunification services for both parents.

Following an unsuccessful period of reunification services, the court terminated parental rights as to both parents on December 18, 2025, and approved the permanent plan of adoption for A.D. Sadly, X.D. passed away while in the care of his foster parents and is no longer a subject of this appeal.

Father timely filed a notice of appeal.

*Proceedings Related to ICWA*

When initially questioned by the social worker on February 11, 2022, Mother and Father both denied having any Native American ancestry. At the detention hearing, Father again denied having any Native American ancestry, while Mother stated she had Native American ancestry on her mother's side of the family. She stated it was Navajo from New Mexico, and she identified her grandmother Sandra L. (the children's great-

3

grandmother) as someone who would have additional information. Mother again stated on her ICWA-020 and CFS-030 forms that she had Native American ancestry and identified the tribe as Navajo from New Mexico.

On March 3, 2022, CFS contacted Sandra who reported, " 'We're not part of a tribe. But we have Navajo in our system. We did a DNA ancestry test and my daughter is 38% Indian so I may be about 50%. … My dad had told us a long time ago that we had Navajo. He said that his grandmother lived in New Mexico where Navajos are at and then they all moved to Montana. We have no one left in New Mexico and we haven't had anyone there for many years.' " Sandra reported she was " 'told that story many years ago' " but " 'would not even know how to look it up at this point.' " She reported her father, Anastacio, and his grandmother were not enrolled tribal members, did not live on a reservation, and did not attend tribal schools. She also reported there were no other family members to contact as her parents and grandparents were deceased.

At the disposition hearing on September 28, 2022, the court adopted the findings and orders recommended by CFS, which included a finding that ICWA "may" apply. In July 2023, Mother, Father, and maternal great aunt Gina H. each denied having any Native American ancestry.

As of the October 2024 and March 2025 status reports, CFS began reporting that ICWA did not apply.

On May 2, 2025,[3] the court held an ICWA review hearing. Ahead of the hearing, CFS filed a report that provided a recap of much of the ICWA information set forth *ante*, although it omitted that Mother claimed Navajo ancestry at the detention hearing and on her ICWA-020 and CFS-030 forms. The report added that on April 29, paternal aunt Maria V. denied having any Native American ancestry. At the hearing on May 2, counsel for CFS (county counsel) noted a family member had claimed Navajo ancestry. County counsel said he believed letters of inquiry had been sent to the tribe and the Bureau of Indian Affairs (BIA), and he asked the court to defer its ICWA ruling to allow the letters to be provided. The court granted the request.

On October 23, CFS filed another ICWA update report. The report stated that on August 26, the social worker sent letters of inquiry to three tribes (Navajo Nation, Ramah Navajo Chapter of Navajo Nation, and Serrano Nation of Mission Indians) but the letters were returned as undeliverable. Copies of the returned envelopes were attached to the report. The social worker also attempted to email the BIA on August 26 using the email address she had on file, but the email "appeared to be undeliverable." On October 15, the social worker sent two certified letters of inquiry, one to the BIA, and one to the "Navajo Nation, Arizona, New Mexico, and Utah Navajo Indian Child Welfare Act Program." Copies of certified mail receipts for the letters were attached to the report, along with a letter addressed to the BIA, dated August 26. The letter provided the name and date of birth of A.D. and two of her siblings. It then stated in relevant part: "According to

<hr>

[3] All further date references are to the year 2025, unless noted otherwise.

ICWA I am attempting to verify whether the family is connected to a Native American tribe, as the tribe would intervene in the case.  [¶] Please let me know if there is more information needed.  I appreciate your prompt attention to this matter."  As of the time the report was filed, no responses had been received.

Ahead of the section 366.26 hearing on December 18, CFS filed two ICWA update reports.  The first report stated CFS had not received any responses from the BIA or the Navajo Nation.  The second report stated that on December 17, paternal aunt Lupe V., her husband Antonio V., and paternal aunt Angie S., all denied having any Native American ancestry.  Angie stated " 'no one [on Father's side of] the family has Native American ancestry that she is aware of.' "  The social worker also attempted to contact maternal aunt Sonia Z., maternal grandmother Christina Z., paternal grandmother Christina G., and paternal aunt Jessica G. on December 17, but she was unable to reach any of them.

County counsel informed the court at the section 366.26 hearing that they had not received a response from the BIA or the Navajo Nation.  The court then found that CFS had satisfied its duty of inquiry, and that ICWA did not apply.

## DISCUSSION

Father contends there is insufficient evidence to support the juvenile court's finding that ICWA did not apply because CFS did not adequately discharge its duty of further inquiry under section 224.2, subdivision (e), and it did not provide sufficient documentation from which the court could conclude it did.  We agree.

6

A. *General ICWA Principles*

ICWA is a federal law that was enacted to further the federal policy " 'that, where possible, an Indian child should remain in the Indian community.' " (*Mississippi Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 37; *In re W.B.* (2012) 55 Cal.4th 30, 48.) To that end, "ICWA establishes minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1129 (*Dezi C.*); 25 U.S.C. § 1901, et seq.)

The issue of whether ICWA applies in a dependency proceeding turns on whether the minor is an "Indian child" as defined under the law. (*Dezi C.*, *supra*, 16 Cal.5th at p. 1129.) Both ICWA and California law implementing ICWA (Cal-ICWA) define an " 'Indian child' " as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); § 224.1, subd. (b)(1).) However, because it is not typically self-evident whether a child is an Indian child, federal and state law both mandate certain inquiries to be made in each case. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 742, overruled on other grounds in *Dezi C.*, *supra*, 16 Cal.5th at p. 1152, fn. 18.)

Under California law, the court and the child protective agency have an "affirmative and continuing duty" to inquire whether a child who is the subject of a dependency proceeding is, or may be, an Indian child. (§ 224.2, subd. (a); rule 5.481(a).)

This duty incorporates the initial duty to inquire and the duty of further inquiry. (*Dezi C.*, *supra*, 16 Cal.5th at pp. 1131–1132; *In re D.S.* (2020) 46 Cal.App.5th 1041, 1052 (*D.S.*).) The initial duty to inquire arises with the child protective agency's initial contact with a child and his or her family and requires the agency to ask all involved persons whether the child is or may be an Indian child. (*D.S.*, *supra*, 46 Cal.App.5th at p. 1052; § 224.2, subds. (a), (b).) For its part, the juvenile court is required, at the first appearance in a dependency case, to "ask each party to the proceeding" and "all other interested persons present" … whether they know or have reason to know that the child is an Indian child." (§ 224.2, subd. (c).)

The duty of further inquiry arises when the agency has "reason to believe" that an Indian child is involved. (§ 224.2, subd. (e); *Dezi C.*, *supra*, 16 Cal.5th at p. 1132.) Reason to believe is statutorily defined as "information suggesting that either the parent of the child or the child is a member or citizen, or may be eligible for membership or citizenship, in an Indian tribe." (§ 224.2, subd. (e)(1).) Courts have broadly construed the reason to believe standard because "broad application is essential to the remedial purpose of the affirmative and ongoing duty to inquire under California law." (*In re I.F.* (2022) 77 Cal.App.5th 152, 163; *In re T.G.* (2020) 58 Cal.App.5th 275, 295.)

Once the duty of further inquiry is triggered, section 224.2, subdivision (e), requires the child protective agency to satisfy three requirements. First, it must interview the parents, Indian custodian, and extended family members to gather the pertinent information about the child's tribal affiliation, as set forth in section 224.3, subdivision

(a)(5).[4]  (§ 224.2, subd. (e)(1).)  Second, it must contact the BIA and the State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member or eligible for membership. (§ 224.2, subd. (e)(2)(B).)  Third, it must contact the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's tribal membership or eligibility.  (§ 224.2, subd. (e)(2)(C).)  "Contact with a tribe shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of notices under [ICWA]" and "shall include sharing information identified by the tribe as necessary for the tribe to make a membership or citizenship eligibility determination, as well as information on the current status of the child and the case."  (§ 224.2, subd. (e)(2)(C).)

If the further inquiry "results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply."  (*D.S.*, *supra*, 46 Cal.App.5th at p. 1052; § 224.2, subd. (f).)  Conversely, if the child protective agency has complied with its duty of inquiry and there is no reason to know that the child is an Indian child, the court may find that ICWA does not apply.  (§ 224.2, subd. (i)(2); rule 5.481(b)(3)(A).)

To aid the court in making its ICWA determination, the child protective agency is required to document and "include in its filings a detailed description of all inquiries, and

---

[4] "This required information includes:  All known names of the Indian child, biological parents, grandparents, and great-grandparents, including maiden, married, and former names or aliases, as well as their current and former addresses, birth dates, places of birth and death, tribal enrollment information of other direct lineal ancestors of the child, and any other identifying information.  (§ 224.3, subd. (a)(5).)"  (*In re D.F.* (2020) 55 Cal.App.5th 558, 566, fn. 6.)

9

further inquiries it has undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes." (Rule 5.481(a)(5).)

The juvenile court has a responsibility to ascertain that the child protective agency has conducted an adequate investigation into a child's Indian ancestry. (*In re K.R.* (2018) 20 Cal.App.5th 701, 709.) "[T]he court may not find that ICWA does not apply when the absence of evidence that a child is an Indian child results from [an] inquiry that is not proper, adequate, or demonstrative of due diligence." (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 408.) The court must have sufficient facts " 'about the claims of the parents, the extent of the inquiry, the results of the inquiry, the notice provided any tribes and the responses of the tribes to the notices given. Without these facts, the juvenile court is unable to find, explicitly or implicitly, whether the ICWA applies.' " (*Ibid.*)

We will uphold the juvenile court's finding that ICWA does not apply so long as the court's conclusions are supported by sufficient evidence and documentation in the record. (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141; § 224.2, subd. (i)(2); rule 5.481(a)(5).) When the juvenile court has a well-developed record, it is afforded relatively broad discretion in making the fact-specific determination that the child protective agency complied with the Cal-ICWA requirements. (*Dezi C.*, at p. 1141.) If, however, a record is not well-developed because inquiry was not properly undertaken and reported as required, then the juvenile court's discretion necessarily becomes more limited. (*Id.* at pp. 1141, 1151.) In those cases, conditional reversal is required because, until the agency gathers, shares, and documents the information required by Cal-ICWA, it is not possible

to know what information a properly conducted inquiry might reveal. (*Id*. at pp. 1136, 1152.)

Issues of ICWA compliance can be raised on appeal by either parent. (*In re B.R.* (2009) 176 Cal.App.4th 773, 779 ["although Mother is not the parent with alleged Indian heritage, she still has standing to raise the issue of ICWA compliance"]; *In re T.G.*, *supra*, 58 Cal.App.5th at p. 291.)

B. *Application to the Present Case*

1. *Reason to Believe*

The parties are in agreement that the initial inquiry established a reason to believe that A.D. was an Indian child.

Mother stated at the detention hearing and documented on the ICWA-020 and CFS-030 forms that she had Native American ancestry on her mother's side of the family through the Navajo in New Mexico. The social worker then followed up with the maternal great-grandmother, who stated that although her family had not lived on a reservation and were not enrolled tribal members, she had been told by her father, " 'that we had Navajo' " based on his grandmother having " 'lived in New Mexico where Navajos are at.' "

The representation that a parent "may have Indian heritage from a tribe in New Mexico" is sufficient to establish a reason to believe, and to trigger the duty of further inquiry. (*In re D.F.*, *supra*, 55 Cal.App.5th at p. 569; see *In re T.G.*, *supra*, 58 Cal.App.5th at p. 292, see *id*. at pp. 283–285 [mother's belief that she had Cherokee ancestry through an unknown relative, confirmed by the maternal grandmother,

11

"triggered the Department's duty to make further inquiry"].)  We therefore agree with the parties that the initial inquiry provided a reason to believe because it "suggest[ed]" that Mother or A.D. "may be eligible for membership or citizenship, in an Indian tribe." (§ 224.2, subd. (e)(1).)

2. *Further Inquiry*

Once the duty to conduct further inquiry is triggered, the child protective agency is obligated to make a " 'meaningful effort' " to locate and interview extended family members and to contact the BIA and the tribes.  (*In re K.T.* (2022) 76 Cal.App.5th 732, 744; *In re K.R.*, *supra*, 20 Cal.App.5th at p. 709.)  The agency does not have " 'an absolute duty to ascertain or refute Native American ancestry,' " but it is required to make "a good faith effort" to gather the pertinent information about a child's tribal affiliation and to provide that information to the relevant tribes.  (*In re D.F.*, *supra*, 55 Cal.App.5th at p. 570; § 224.2, subd. (e)(2)(A), (C).)  " 'The burden is on the Agency to obtain all possible information about the minor's potential Indian background and [to] provide that information to the relevant tribe or, if the tribe is unknown, to the [BIA].' " (*In re Josiah T.*, *supra*, 71 Cal.App.5th at p. 405.)  Because many cases do not proceed beyond the inquiry stage, "ensuring adequacy and accuracy at this first step is critical if the rights of tribes under ICWA and California law are to be meaningfully safeguarded, as was intended by Congress and our state Legislature."  (*In re K.H.* (2022) 84 Cal.App.5th 566, 591.)

Here, the social worker attempted to contact the BIA and the Navajo Nation of Arizona, New Mexico, and Utah, as required.  (§ 224.2, subd. (e)(2)(B) & (C).)  But there

is no indication in the record that the social worker provided the BIA or the Navajo Nation with any information about A.D.'s family background, her potential tribal affiliation, or any other information CFS obtained during the course of their ICWA inquiry.

CFS maintains that it was not obligated to provide any of that information. CFS takes the position that it appropriately discharged its duty of further inquiry by contacting the BIA and the Navajo Nation, and by providing them with A.D.'s name and date of birth.

We reject this argument for a couple reasons. First, it is not clear from the record what information CFS provided to the Navajo Nation as the social worker did not sufficiently document that information. The record contains only a single letter to the BIA. Second, even if we were to assume the social worker provided the same information to the Navajo Nation as she did to the BIA, simply providing the child's name and date of birth does not reflect a good faith effort to comply with the duty of further inquiry when CFS had information that A.D.'s potential tribal affiliation was with the Navajo in New Mexico, and had the names of maternal relatives going back several generations, but failed to share any of that information.

Section 224.2, subdivision (e), provides that when conducting further inquiry based on a reason to believe, "[c]ontact with a tribe shall include sharing information identified by the tribe as necessary for the tribe to make a membership or citizenship eligibility determination." (§ 224.2, subd. (e)(2)(C).) CFS contends that it "cannot assume what information the tribes may find relevant to their determination [of] whether

13

a child is an Indian Child," and suggests that if any further information was needed to determine A.D.'s tribal affiliation, the tribe could have responded to their letter of inquiry, but it did not. We are not persuaded by this argument. While it is true that different tribes will necessarily have different criteria for determining membership, CFS can safely assume that when inquiring about a child whose potential tribal affiliation is several generations removed, the tribe will require more information than the child's name and date of birth. The inquiry and notice requirements of Cal-ICWA, make it clear that tribes require biographical information that is as accurate and complete as possible to assess whether a child is a tribal member or is eligible for membership. (§§ 224.2, 224.3, subd. (a)(5).) We also cannot fault the Navajo Nation for not responding to the letter of inquiry CFS sent (again, assuming the Navajo Nation received the same letter as the BIA) when the letter did not even reference that Mother had claimed Navajo ancestry.

Finally, we find the case of *D.S.*, *supra*, 46 Cal.App.5th 1041, on which CFS relies to be distinguishable. In *D.S.*, the child protective agency received information that the child's "great-great-great-great-grandmother—was 'affiliated with the Sioux and Blackfeet tribes,' " although she was not an enrolled member and did not live on the reservation. (*Id*. at p. 1046.) In response to receiving this information, the agency contacted, or attempted to contact, 12 separate tribes. One tribe responded the child was not a member, two tribes agreed to check their records, and one stated that it would require formal ICWA notice. The agency made "multiple attempts to communicate with eight other tribes" but was unable to contact them. (*Id*. at p. 1047.) At the jurisdiction hearing, the juvenile court found the agency had conducted a reasonable inquiry and there

was no reason to know ICWA applied. The court found the information related to the child's tribal affiliation was " 'so attenuated that [it was] really difficult to track it down, and … the Agency has made more than a reasonable effort to try and do so.' " (*Ibid.*) The appellate court affirmed, concluding "the Agency followed the proper procedures in conducting its further inquiry, but the limited information provided by Aunt was too attenuated for the Agency to do anything further." (*Id*. at p. 1054.)

Like *D.S.*, *supra*, 46 Cal.App.5th 1041, CFS was provided with information that A.D.'s potential tribal affiliation was several generations removed, and that her family had not lived on a reservation and were not enrolled tribal members. But unlike *D.S.*, where the agency contacted four tribes and made "multiple attempts" to contact eight other tribes to inquire about the child's potential tribal affiliation (all before the jurisdiction hearing), here CFS sent a single letter of inquiry to the Navajo Nation three-and-a-half years after it learned that Mother may have Navajo ancestry, and the social worker did not share with the tribe any of the information CFS gathered about A.D.'s family background or her potential tribal affiliation. Accordingly, we cannot say on this record that CFS conducted an adequate further inquiry.[5]

---

[5] In emphasizing the attenuated nature of A.D.'s potential tribal affiliation, CFS also asserts that no other maternal relative provided information that A.D had any Native American ancestry. We do not find that argument persuasive because the only other maternal relative CFS contacted was maternal great aunt Gina H. The social worker attempted to contact two additional maternal relatives (maternal aunt Sonia Z. and maternal grandmother Christina Z.) the day before the section 366.26 hearing, but she was unable to reach them.

Again, once the duty of further inquiry is triggered, the child protective agency is required to make a good faith effort to gather the pertinent information about a child's potential tribal affiliation, and to provide that information to the relevant tribes. (§ 224.2, subd. (e)(2)(A), (C); rule 5.481(a)(5); *In re D.F.*, *supra*, 55 Cal.App.5th at p. 570; *In re Josiah T.*, *supra*, 71 Cal.App.5th at p. 405.) Here, CFS gathered information about A.D.'s Native American ancestry, but then it failed to provide any of the information it gathered to the BIA or the Navajo Nation. To the extent it did provide that information, it did not document it as required under rule 5.481(a)(5). We therefore agree with Father that the record lacks sufficient evidence from which the court could conclude CFS conducted an adequate inquiry into A.D.'s Indian ancestry. (See *In re Josiah T.*, at p. 408 ["the court may not find that ICWA does not apply when the absence of evidence that a child is an Indian child results from [an] inquiry that is not proper, adequate, or demonstrative of due diligence"].)

We therefore conditionally reverse and remand the matter for CFS to appropriately discharge its duty of further inquiry under section 224.2, subdivision (e), and to document its inquiry in compliance with rule 5.481(a)(5). (See *Dezi C.*, *supra*, 16 Cal.5th at pp. 1136, 1151–1152.)

## DISPOSITION

The order terminating parental rights is conditionally reversed and the matter is remanded to the juvenile court for CFS to comply with the inquiry, and if applicable, the notice provisions of sections 224.2 and 224.3, and the documentation provisions of rule 5.481(a)(5). Thereafter, the juvenile court is directed to hold a hearing to determine

16

whether ICWA applies.  If the court determines that ICWA applies, it shall proceed in conformity with ICWA and related California law.  If the court determines ICWA does not apply, it shall reinstate the order terminating parental rights.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

MILLER
J.
RAPHAEL
J.

17